you ladies and gentlemen for their protection. We are at war. You have a duty to perform here.

As a representative of your Government I am calling upon every one of you to do your duty.

*Id.* at 247 n.3. Even if the remarks at issue in the case before us today embody an appeal to the nationalism of the jury, nothing about the closing argument's approbation of the American criminal justice system remotely approaches the prejudicial argument made in *Viereck*, especially under a plain error standard. As for the prosecutor's argument in rebuttal about the currency exchange, these comments responded to Defendant's closing argument, in which Emuegbunem maintained that he had brought the $8,000 found on his person upon his arrest with him to Canada from Nigeria. In context, then, the rebuttal did not appeal to the jury's nationalism, and we reject Defendant's claim.

### Conclusion

For the foregoing reasons, we affirm Defendant's conviction.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2001 FED App. 0358P (6th Cir.)
File Name:  01a0358p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

        *v.*                                    No. 00-1399

CHUCKS EMUEGBUNAM,
    *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 98-80299—Denise Page Hood, District Judge.

Submitted:  August 8, 2001

Decided and Filed:  October 5, 2001

Before:  KEITH, NORRIS, and BATCHELDER, Circuit
Judges.

————————————

## COUNSEL

**ON BRIEF:** Martin J. Beres, St. Clair Shores, Michigan, for Appellant.  Kathleen Moro Nesi, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. Chucks Emuegbunam, Oakdale, Louisiana, pro se.

---

**OPINION**

---

ALICE M. BATCHELDER, Circuit Judge.  On June 16, 1998, a federal grand jury returned an indictment against "Chucks Emuegbunam a/k/a 'Chuck,'"[1] a citizen of Nigeria who had been arrested in Canada, on one count of conspiring with an individual named Johnnie D. Player and others to import approximately 800 grams of a substance containing heroin into the United States in violation of 21 U.S.C. §§ 952, 960, and 963.[2]  Following his extradition to the United States, Defendant filed numerous pretrial motions both pro se and through counsel, the most significant of which for purposes of this appeal include a motion for a pre-trial hearing to determine the admissibility of co-conspirator statements, a motion to strike and amend the indictment, and a motion to dismiss the indictment pursuant to Article 36(1)(b) of the Vienna Convention on Consular Relations.  The district court denied these motions.

Shortly before trial, the district court entered an order allowing Emuegbunem to represent himself with advisory

---

[1] The record variously refers to the Defendant as "Chuks," "Chucks," or "Chuck" and alternates between using "Emuegbunam" and "Emuegbunem" as his surname.  Because the Defendant has averred that his proper name is "Chuks Emuegbunem," and Defendant's passport uses this spelling, we will refer to him as "Emuegbunem" or "Defendant" unless quoting or discussing material using a different spelling.

[2] Actually, a grand jury first indicted Emuegbunem on February 19, 1997.  After our decision in *United States v. Ovalle*, 136 F.3d 1092 (6th Cir. 1998) (holding that certain grand jury selection procedures used in the Eastern District of Michigan violated the Jury Selection and Service Act, 28 U.S.C. § 1861, and the equal protection principles of the Fifth Amendment), the district court dismissed the indictment without prejudice.  On March 20, 1998, a criminal complaint charged Emuegbunem with conspiracy to import heroin, and the grand jury superseded the complaint with the indictment that led to Defendant's trial and conviction.

public reputation of the judicial proceedings.  *United States v. Kingsley*, 241 F.3d 828, 835-36 (6th Cir. 2001) (citations omitted), *petition for cert.* filed No. 00-10459 (June 5, 2001).  Only in exceptional circumstances in which the error is so plain that the trial judge and prosecutor were derelict in countenancing it will this court reverse a conviction under the plain error standard.  *Carroll*, 26 F.3d at 1383 (citations omitted).

"Unless calculated to incite the passions and prejudices of the jurors, appeals to the jury to act as the community conscience are not per se impermissible." *Solivan*, 937 F.2d at 1151.  The Supreme Court's decision in *Viereck v. United States*, 318 U.S. 236 (1943), guides this court's determination of whether a prosecutor intends his comments to incite prejudice and passion in the jury.  *Id.*  In *Viereck*, the Court reversed the conviction of a German foreign agent for willfully failing to inform the Secretary of State of certain business activities through which he systematically engaged in propaganda on behalf of Germany.  Although the Court reversed based on its interpretation of the statute under which Viereck had been convicted, the Court noted that the prosecutor's closing argument "might well have placed the judgment of conviction in jeopardy." 318 U.S. at 247.  The prosecutor's closing argument in *Viereck* included this exhortation:

In closing, let me remind you, ladies and gentlemen, that this is war.  This is war, harsh, cruel, murderous war.  There are those who, right at this very moment, are plotting your death and my death; plotting our death and the death of our families because we have committed no other crime than that we do not agree with their ideas of persecution and concentration camps.  This is war.  It is a fight to the death.  The American people are relying on you ladies and gentlemen for their protection against this sort of a crime, just as much they are relying upon the protection of the Men who man the guns in Bataan Peninsula, and everywhere else.  They are relying upon

led him to the car. A reasonable inference arising from this evidence is that Player's call to Chuks upon arriving in the United States triggered a series of events that culminated in the meeting with Jeff at the airport. In this sense, the prosecutor's statement that Player was able to get Jeff to fly to Detroit constitutes an accurate summation of the evidence. Because prosecutors "must be given leeway to argue reasonable inferences from the evidence," *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000) (quoting *United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir. 1996)), no impropriety attached to the prosecutor's presentation of his interpretation of the evidence. Moreover, prior to making the statement, the prosecutor cautioned the jury that his argument did not constitute evidence. Further, the district court instructed the jury that the lawyers' arguments were not evidence. These additional safeguards generally cure any improprieties in a closing argument. *Byrd*, 209 F.3d at 537; *Carroll*, 26 F.3d at 1389 n.12, *United States v. Ashworth*, 836 F.2d 260, 267 (6th Cir. 1988).

Finally, Defendant maintains that the prosecutor's closing argument and rebuttal deprived him of a fair trial by arousing the national biases of the jury and by insinuating that he was a liar. Because Defendant objected to neither the prosecutor's preface to his closing argument, in which he extolled the virtues of the American criminal justice system, nor the remarks in rebuttal addressed to the currency exchange, this court reviews only for plain error. "Where, as here, a criminal defendant has failed to object below, he or she must demonstrate that the error was plain as defined by [Rule 52 of the Federal Rules of Criminal Procedure] before we may exercise our discretion to correct the error." *United States v. Koeberlein*, 161 F.3d 946, 949 (6th Cir. 1998) (footnote omitted). "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." FED. R. CRIM. P. 52(b). To establish plain error, a defendant must show that: (1) an error occurred in the district court; (2) the error was obvious or clear; (3) the error affected defendant's substantial rights; and (4) this adverse impact seriously affected the fairness, integrity, or

counsel appointed to assist in his defense as needed. Following a six-day trial, the jury returned a verdict of guilty on September 23, 1999. At the close of neither the prosecution's case nor his own did Defendant move for a judgment of acquittal.

On October 18, 1999, Emuegbunem filed a post-trial motion seeking a judgment of acquittal or, in the alternative, a new trial based on the sufficiency of the evidence, the government's alleged interference with obtaining a defense witness through compulsory process, and alleged prosecutorial misconduct during closing arguments. At a hearing the district court concluded that Defendant did not timely file the motion, but proceeded to deny the motion on the merits. Departing downward from the guideline range of seventy-eight to ninety months imprisonment pursuant to U.S.S.G. § 5K2.0, the district court sentenced Emuegbunem to the statutory minimum term of sixty months imprisonment to be followed by four years of supervised release. This timely appeal followed. For the reasons that follow, we will affirm Defendant's conviction.

### I. Statement of Facts

Evidence adduced at trial demonstrates that at approximately 2:00 a.m. on February 13, 1997, Johnnie Player attempted to enter the United States from Canada at the Blue Water Bridge in Port Huron, Michigan. When Player could not produce identification, United States customs officials referred him to a secondary inspection, during which inspectors found a bag of marijuana in the pocket of Player's pants and a three-by-five index card on which the names "Chucks" and "Jeff" appeared next to a hotel phone number and the notation "extension 1403," and a phone number with a New Jersey area code, respectively. A subsequent search of Player's car turned up a computer modem box under the front seat containing sixty-nine pellets filled with a white powdery substance that weighed 675.5 grams and tested positive for seventy percent pure heroin hydrochloride.

Initially, Player maintained that an individual named Acadak, his former brother-in-law, arranged for him to pick up the heroin in Toronto. After a conversation with his brother, a Michigan state trooper, Player decided to cooperate with the authorities. Player then gave a statement that Jeff from New Jersey, whom he had met through Acadak, directed him to meet "Chuks" at Room 1403 of the Crowne Plaza Hotel in Toronto with $15,000 of the heroin's $65,000 purchase price on February 12, 1997, around 9:00 p.m. Player indicated that he had never met Chuks before and that Chuks supplied him with the pellets in his hotel room. When Player informed Chuks that he had brought only $10,000 with him, Chuks admonished him to bring half of the purchase price with him in the future as a down payment and told him to deliver the balance to Jeff the next day at the Detroit Metropolitan Airport. Chuks also asked Player to call him at the hotel, as well as Jeff in New Jersey, upon his safe return to the United States.

With Player's consent, investigators recorded his calls to Chuks, for whom Player left a voice mail message, and Jeff, who an unidentified individual indicated had left for Detroit on a flight scheduled to arrive that afternoon. Agents arranged for Player and one undercover customs agent acting as Player's cousin to meet Jeff at the airport. When Jeff arrived he met Player and the undercover agent. A transcript of the recorded meeting shows that Player and Jeff discussed the balance of the money owed for the heroin, and mentioned "Chuck" in their conversation. When Player and the undercover agent took Jeff to the trunk of Player's car to retrieve the money, Jeff was arrested. Authorities later identified Jeff as Jeff Emuegbunem, also known as Jophet Uwafil-Iloba, the brother of Defendant Chuks Emuegbunem.

Meanwhile, customs agents had contacted the Royal Canadian Mounted Police ("RCMP") with the information Player had provided about Defendant's activities at the Crowne Plaza Hotel. The RCMP undertook its own investigation and learned that hotel records listed the occupant of room 1403 as "Mr. E. Chucks." When advised

is proper during closing arguments. *United States v. Drake*, 885 F.2d 323, 324 (6th Cir. 1989).

Similarly, the prosecutor's comment that Player cannot "come into a courtroom and lie . . . to try to put or fabricate a case on another person" reflects his attempt to explain the evidence. In context the prosecutor by this remark attempted to give the jury a choice: either accept Player's testimony, the inconsistencies of which are the product of a distraught individual in serious trouble; or conclude that Player has tried to frame Emuegbunem. To foreclose the latter conclusion, the prosecutor emphasized the evidence of record other than Player's testimony. This tactical decision—not prosecutorial misconduct—accounts for the description of Player as a "wizard." Accordingly, there is nothing improper about the remarks concerning Player's character.

Even so Defendant argues that the prosecutor based the statement that Player "had never been caught up in this kind of trouble before" upon evidence known to be false. For this reason, Defendant maintains that his conviction cannot stand. But this position takes the comment out of its context. The record clearly reflects that Player and the prosecutor were both referring to the circumstances that led Player to call his brother and cooperate with the authorities: namely, having been caught crossing the Canadian border with 675.5 grams of heroin. For this reason, no misconduct attended the prosecutor's argument to the jury regarding the kind of trouble in which Player found himself.

Defendant next contests the accuracy of the statement that Player was "able to get this individual to fly from New Jersey to Detroit." The evidence adduced at trial shows that Chuks instructed Player to call him at the hotel and Jeff in New Jersey upon arriving safely in the United States and to meet Jeff the next day at the Detroit Metropolitan Airport with the balance of the payment for the heroin. After leaving a message for Chuks, Player reached an unidentified individual at Jeff's number in New Jersey who provided flight information for Jeff. Player then met Jeff at the airport and

trial, . . . or so gross as probably to prejudice the defendant." *Pritchett*, 117 F.3d at 964 (citations omitted).

*United States v. Tocco*, 200 F.3d 401, 420-21 (6th Cir. 2000).

"Improper vouching occurs when a jury could reasonably believe that a prosecutor was indicating a personal belief in a witness' credibility." *Taylor v. United States*, 985 F.2d 844, 846 (6th Cir. 1993) (per curiam) (citing *Causey*, 834 F.2d at 1283). Improper vouching also occurs when the prosecutor argues evidence not in the record, *United States v. Martinez*, 981 F.2d 867, 871 (6th Cir. 1992) (citation omitted), or when the prosecutor supports the credibility of a witness by expressing a personal belief in the truthfulness of the witness's testimony, thereby placing the prestige of the office of the United States Attorney behind that witness. *Francis*, 170 F.3d at 550.

Under these definitions Defendant contends that the prosecutor's statement about Player's "character," in particular the remarks that Player "had never been caught up in this kind of trouble before" and cannot "come into a courtroom and lie . . . to try to put or fabricate a case on another person," constitute improper vouching. "It is clear that the Government misled the jury to believe that Player was a good guy, of wholesome character who was uncharacteristically caught up in an isolated drug courier situation. That he should be believed because he 'came clean' and cooperated with the government to join forces against the real villain, Defendant."

Although the record reflects that Player had a criminal record from previous drug transactions, Player testified that when he was arrested he was scared, hysterical, and "in a bunch of trouble." Player also stated that he had "never been in trouble like this before." In light of this testimony, the prosecutor's challenged statement neither argued facts not in the record nor expressed a personal opinion about Player's credibility. Rather, the prosecutor "summarize[d] the evidence and comment[ed] upon . . . its . . . significance" as

that the occupant was checking out of the hotel, the RCMP arrested him. A search of Emuegbunem yielded approximately $8,000 in United States currency. Pursuant to a warrant, the RCMP searched room 1403 and recovered Defendant's organizer containing a receipt from Western Union for $1,000 wired to Jeff Emuegbunem in New Jersey on February 13, 1997; Defendant's address book listing Jeff Emuegbunem's phone number in New Jersey under the letter "J" and a number for Johnnie Player on the same page; a piece of paper in the garbage can subtracting 10,000 from 62,100 and also bearing the number 31,500; and a note found in Defendant's briefcase reading, "He must come with at least ½ next time." The hotel's records reflect that during his stay Defendant made twelve calls to Jeff Emuegbunem's phone number in New Jersey. These records also show that Defendant paid cash on a daily basis for his stay at the hotel beginning on February 9, 1997. Until his extradition Defendant remained in Canadian custody following his arrest, and the Canadian government eventually dismissed charges in favor of indictment by American authorities.

## II. The Vienna Convention on Consular Relations

Claiming that federal officials violated his rights under the Vienna Convention on Consular Relations, Apr. 24, 1963, art. 36, 21 U.S.T. 77, 596 U.N.T.S. 261 (1969) ("Vienna Convention"), which, upon the arrest of a foreign national, requires notification of the diplomatic representatives of the nation of which the individual taken into custody is a citizen, and that this violation prejudiced his defense, Emuegbunem seeks dismissal of the indictment or, in the alternative, reversal of his conviction.

### A.  Factual Basis of the Claim

Sometime in June 1999, approximately one year after his extradition to the United States, Emuegbunem complained to the district court that prosecutors had not honored his rights under the Vienna Convention. At a hearing on June 8, 1999, the district court allowed the parties additional time to research the matter. Treating Defendant's complaint as a

motion for the assistance of Nigerian consular officials, at a hearing on June 18, 1999, the district court directed the prosecutor to contact the Nigerian consulate. Subsequently, both the prosecutor and Emuegbunem did so. The prosecutor sent a letter informing the Nigerian consulate of the crime with which Emuegbunem had been charged, the location at which he was being held, and the name and address of his attorney. For his part, Defendant sought the assistance of Nigerian officials in procuring witnesses and physical evidence from Nigeria. In a letter dated August 13, 1999, the Nigerian Embassy in Washington, D.C., sent Defendant the following letter:

I am directed to ackwoledge [sic] the receipt of your letter and other relevant attached documents regarding your case # 98-CR-80299-DT. However, we have not been informed nor have it in our record as a notice of your arrest not until you called and left a message in the voice mail. Also the request for your witnesses who resides [sic] in Nigeria to be at your trial is untimely given the fact your witnesses if contacted would require at least two months to seek and obtain travel documents which include US visa, this is because of their new rule now.

Can we now look forward to the August 31st 1999 for the trial and see what is coming out and then we can go from there. My senior officer (A.A. Musa) is not in the country right now. He is to initiate the approval for our coming to be at the trial which I cannot guarantee if we will be coming or not, but at any case we wish you the best.

Upon receipt of the letter, Emuegbunem filed a motion to dismiss the indictment pursuant to the Vienna Convention and claimed prejudice from the denial of earlier contact with Nigerian diplomatic representatives.

Emuegbunem's claim of prejudice arises from the defense he wanted to make at trial. Under the defense theory of the case, Emuegbunem, an executive with a Nigerian

of the jury facts not in evidence. *United States v. Wiedyk*, 71 F.3d 602, 610 (6th Cir. 1996) (citing *United States v. Leon*, 534 F.2d 667, 679 (6th Cir. 1976)). Likewise, a prosecutor cannot improperly vouch for the credibility of his witnesses, *United States v. Causey*, 834 F.2d 1277, 1283 (6th Cir. 1987), or incite the passions and prejudices of the jury by appealing to the national or community interests of jurors. *United States v. Solivan*, 937 F.2d 1146, 1151-52 (6th Cir. 1991) (citing *Viereck v. United States*, 318 U.S. 236, 247-48 (1943)).

When reviewing claims of prosecutorial misconduct, we determine first whether the statements were improper. *See United States v. Krebs*, 788 F.2d 1166, 1177 (6th Cir.1986). If they appear improper, we then look to see if they were flagrant and warrant reversal. *See United States v. Carroll*, 26 F.3d 1380, 1388 (6th Cir.1994). To determine flagrancy, the standard set by this Court is: 1) whether the statements tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused. *United States v. Monus*, 128 F.3d 376, 394 (6th Cir.1997) (citing *United States v. Cobleigh*, 75 F.3d 242, 247 (6th Cir.1996)); *Carroll*, 26 F.3d at 1385 (citing *United States v. Leon*, 534 F.2d 667, 679 (6th Cir.1976)). To reverse a conviction because of an improper non-flagrant statement, a reviewing court must determine that: 1) the proof of the defendant's guilt is not overwhelming; 2) the defense counsel objected; and 3) the trial court failed to cure the impropriety by failing to admonish the jury. *Monus*, 128 F.3d at 394; *Carroll*, 26 F.3d at 1385-86 (citing *United States v. Bess*, 593 F.2d 749, 757 (6th Cir.1979)). *United States v. Francis*, 170 F.3d 546, 549-50 (6th Cir.1999); *see also Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir.1997) (quoting *Serra v. Michigan Dept. of Corrections*, 4 F.3d 1348, 1355-56 (6th Cir.1993)). We will not overturn a verdict unless the prosecutorial misconduct is "so pronounced and persistent that it permeate[d] the entire atmosphere of the

And through the course of the conversation that transpired in that vehicle, not only did they reference how much money was still owed for the down payment, but they also referenced the fact that it was heroin. And the name Chuck or Chucks . . . was also referenced.

During rebuttal the prosecutor delivered the following summation:

One of the main portions of that argument you just heard is with regard to some money that was seized from the person of the Defendant, or at least from his hotel room in Toronto, Canada, because he is a businessman from Nigeria, he had that money, and he had gone to the money exchange to get that money. We will close on that.

*   *   *

Let's now turn to the money.

We are dealing here with a Nigerian businessman, a man who sits on the board of directors of various corporations, a man who is the chief executive officer of these various corporations. A man who comes to the country of Canada for the purposes of attending a seminar in Canada. So he goes to a Nigerian money exchange, and what kind of money does he get? United States currency. So that you can travel in the country of Canada.

Again, Ladies and Gentlemen, allow your reason and common sense to determine if, in fact, that was the case.

Thank you.

Whether the government's closing argument constitutes prosecutorial misconduct presents a mixed question of law and fact that we review de novo. *United States v. Clark*, 982 F.2d 965, 968 (6th Cir. 1993). Statements by a prosecutor in a closing argument are not proper if they bring to the attention

telecommunications company named Intramedia Ltd., attended a trade conference held in Toronto from February 10 to 15, 1997. According to affidavits appended to Defendant's motion to dismiss the indictment, two Nigerian witnesses Emuegbunem wished to present at trial would have testified that on February 5, 1997, Defendant purchased $9,500 worth of American currency before leaving Nigeria for Toronto. At trial Emuegbunem suggested that his arrest stemmed from a case of mistaken identity because an unknown individual named "Chuck," most likely Acadak who was also known as "Oochie" and used approximately twenty aliases, sold the heroin to Player. During pretrial proceedings, defense counsel disclosed this theory of the case to the district court. In his motion to dismiss the indictment, Defendant represented that he wished to call a third Nigerian witness to support this version of events by testifying that an individual named "Uche Odinaka Chuck" had supplied Player with the heroin. Defendant explained that the documents found on his person and in his hotel room that appeared to corroborate Player's story related to a transaction he was attempting to negotiate at the trade conference.

At a hearing on the morning of trial, the district court denied Defendant's motion. Recognizing that the Vienna Convention protects the ability of consular officials to perform their diplomatic functions, the district court posited that allowing a defendant to contact the representatives of his nation constituted the only remedy judicially available for a violation of the treaty. For this reason, the court declined to dismiss the indictment. Although the court conceded that Emuegbunem might suffer some prejudice from not being afforded the opportunity to call the Nigerian witnesses at his trial, it treated the documentary evidence of the currency exchange in Nigeria as mitigating the absence of the oral testimony of the two Nigerian affiants. As for Defendant's claim that there was a third witness who would identify "Oochie" or "Uche" as the "Chuck" who supplied Player with heroin, the court found no connection between lack of notice to Nigerian diplomats under the Vienna Convention and Defendant's inability to obtain the testimony of this witness.

In sum, the court found insufficient prejudice to warrant dismissal of the indictment.

Nonetheless, the district court offered to delay the trial to enable Emuegbunem to obtain witnesses and evidence from Nigeria. Recognizing that Defendant had throughout the pre-trial proceedings insisted upon his rights under the Speedy Trial Act, 18 U.S.C. § 3161, the court advised him that this delay would toll the running of the seventy-day period after indictment within which a criminal trial must occur under the Speedy Trial Act. Defendant elected to proceed to trial without the witnesses, and the trial began that day.

### B. Article 36 of the Vienna Convention

Both the United States and Nigeria are parties to the Vienna Convention, a seventy-nine article, multilateral treaty that governs the establishment of consular relations between nations and defines the functions of a consulate. *United States v. Alvarado-Torres*, 45 F. Supp. 2d 986, 988 (S.D. Cal. 1999), *aff'd*, No. 99-50597, 2000 WL 1256890 (9th Cir. Sept. 5, 2000). Article 36 appears in Chapter II of the treaty, which is entitled "Facilities, Privileges and Immunities Relating to Consular Posts, Career Consular Officers and Other Members of a Consular Post," and provides in its entirety:

**Communication and contact with nationals of the sending State**[3]

1. *With a view to facilitating the exercise of consular functions relating to nationals of the sending State*:

   (a) consular officers shall be free to communicate with nationals of the sending State and to have access to them. *Nationals of the sending State shall have the*

---

[3]Under the language of the treaty, the "sending State" is the nation of the arrested foreign national, and the "receiving State" is the arresting nation. *United States v. Chaparro-Alcantara*, 226 F.3d 616, 620 n.1 (7th Cir.), *cert. denied*, 121 S. Ct. 599 (2000).

Now, we are getting beyond the realm of just being a good liar, we are now getting into the realm of being a wizard. Because, this wizard also indicated to the law enforcement officers not only could he tell them what happened in the past, but he could foretell the future, because he indicated not only did he get the heroin from the Defendant in Toronto, Ontario Canada, but at the time they went through the negotiations and he took receipt of that heroin, he [w]as given instructions that after he returned safely to the United States, he was supposed to make contact with Jeff, the telephone number that's listed on that same file card that was seized from him at the time of his arrest.

And lo and behold, he is able to get this individual to fly from New Jersey to Detroit and thereafter meet him at Detroit Metropolitan Airport, take him to a vehicle, and engage him in conversation—

THE DEFENDANT: Objection again, Your Honor. Mr. Sauget is arguing what is not in evidence. Johnnie Player has never said that he was able to get in touch with Jeff on the phone. Johnnie Players [sic] has testified that was already on the flight when he became aware.

THE COURT: It is noted and preserved for the record and overruled. You may continue.

MR. SAUGET: Thank you.

He was able to get the man to walk to a vehicle and engage him in a conversation with regard to heroin.

Now, this was an individual that Mr. Player had indicated to you that he had known from the past, okay. Think for a moment. He drives out to Detroit Metropolitan Airport, a major international airport in the United States, and is able to walk up to someone and just walk him to a vehicle. That's probably because he knew the person, and he had, in fact, dealt with the man in the past.

So, what we have got here is, I believe, a man who was trying to extricate himself from a problem that he knows he is in deep trouble or we have got ourselves a real wizard. We have got someone who can come into a courtroom and lie, and to try to put or fabricate a case on another person.

THE DEFENDANT: Objection , Your Honor. He is vouching for the credibility of Johnnie Player by saying that he cannot come to the courtroom to lie.

THE COURT: I don't think that's precisely what he is saying, although the Jury may infer that, I suppose. And I think that [the prosecutor] has already said he is not vouching for the witness and that he won't. But he is entitled to speak to the credibility of his witness.

[AUSA SAUGET]: Thank you, Your Honor.

If all you had before you was the bare testimony of Johnnie Player in this case, I would submit to you that based on the instructions that you are going to get from the Judge; and that is to say that you are supposed to look at the testimony of people who are accomplices, people who have been granted reduced criminal liability for purposes of coming in to testify before a jury, I would submit to you that if you only had that testimony, and that bare testimony alone, that it would be your duty to find this Defendant not guilty. But on this record, there is substantially more.

As I have said, we are either dealing here with an individual who is trying to do the right thing, to try to extricate himself in terms of his liability as he testified or we are dealing here with a wizard.

The prosecutor went on to explain that Player must be a "wizard" if he were lying in his testimony because of the additional evidence against Emuegbunem: the index card found on Player at his arrest and the documentary evidence found by the RCMP in room 1403 of the hotel in Toronto.

*same freedom with respect to communication with and access to consular officers of the sending State*;

(b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. *The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph*;

(c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation. They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgment. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such action.

2. *The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended.*

Vienna Convention, 21 U.S.T. at 100-01, 596 U.N.T.S. at 292-94 (emphasis added).

Proper interpretation of a treaty presents a question of law that this court reviews de novo. *United States v. Page*, 232 F.3d 536, 540 (6th Cir. 2000) (citing *United States v. Morgan*, 216 F.3d 557, 561 (6th Cir. 2000)), *cert. denied*, 121 S. Ct. 1389 (2001). Under the Supremacy Clause of the United

States Constitution, "all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land." U.S. CONST. art. VI, cl. 2. Under federal law treaties have the same legal effect as statutes. *See, e.g.*, *Whitney v. Robertson*, 124 U.S. 190, 194 (1888); *Page*, 232 F.3d at 540 (citing *Breard v. Greene*, 523 U.S. 371, 378 (1998) (per curiam)). As a general rule, however, international treaties do not create rights that are privately enforceable in the federal courts.

> A treaty is primarily a compact between independent nations. It depends for the enforcement of its provisions on the interest and honor of the governments which are parties to it. If these fail, its infraction becomes the subject of international negotiations and reclamation, so far as the injured parties choose to seek redress, which may in the end be enforced by actual war. It is obvious that with all this the judicial courts have nothing to do and can give no redress.

*Head Money Cases*, 112 U.S. 580, 598 (1884). *See also Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 306 (1829) ("The judiciary is not that department of the government, to which the assertion of its interests against foreign powers is confided; and its duty commonly is to decide upon individual rights, according to those principles which the political departments of the nation have established."), *overruled in part on other grounds by United States v. Percheman*, 32 U.S. (7 Pet.) 51 (1833). "International agreements, even those directly benefitting private persons, generally do not create private rights or provide for a private cause of action in domestic courts . . . ." RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 907, cmt. a (1987). In fact, courts presume that the rights created by an international treaty belong to a state and that a private individual cannot enforce them. *See, e.g.*, *Goldstar (Panama) S.A. v. United States*, 967 F.2d 965, 968 (4th Cir. 1992) ("International treaties are not presumed to create rights that are privately enforceable."); *Matta-Ballesteros v. Henman*, 896 F.2d 255, 259 (7th Cir. 1990) ("It is well established that

Therefore, we conclude that the prosecution neither substantially interfered with the Defendant's fundamental right to call witnesses in his defense nor improperly declined to offer Jeff Emuegbunem immunity to allow him to testify for the defense.

### B. Misconduct in Closing Arguments

Defendant contends that during closing arguments the prosecutor misstated the evidence, argued evidence known to be false, improperly vouched for one of the government's witnesses, and aroused the national biases of the jury against Emuegbunem. The following comments during the prosecution's closing argument form the basis for these objections:

> Before I launch into my closing argument, I would like to do two things. First of all, I would like to thank you for coming in and serving on this jury here. I know a lot of times it might have been tedious and it might have been painful, economically or otherwise, but quite frankly, it is the jury system that is the fuel for our whole system of government. And if you get a chance if ever to compare the various systems, the legal systems in the world, you will find that this particular system is, by far, the best. Because we have 12 of our citizens to come in and determine the guilt or innocence as opposed to some of other type or an [imam] or some holy man or some type of a star chamber, if you recall your history, that people who have somewhat predetermined ideas as to what a person's fate should be. And, as I said, this particular system is the best.

> * * *

> But let's take . . . a moment and look upon the character of Mr. Player. I would submit that he did not present himself as probably the world's brightest individual. He indicated to you that he was very scared. He was nervous. He had never been caught up in this kind of trouble before.

so.") (citations omitted), *cert. denied*, 526 U.S. 1137 (1999). Only two limited circumstances present possible exceptions to this rule. First, under the "effective defense" theory, immunity may be available when a witness possesses exculpatory testimony that is essential to an effective defense and that strongly outweighs the government's interests in declining to offer immunity. *Talley*, 164 F.3d at 997. Subject to one narrow exception not relevant here,[5] we have rejected the effective defense exception. *United States v. Mohney*, 949 F.2d 1397, 1401 (6th Cir. 1991).

Second, immunity might be warranted to remedy prosecutorial misconduct. "Under this theory, due process requires an immunity grant where the prosecution abuses its discretion by intentionally attempting to distort the fact-finding process." *Id.* at 1402. Accordingly, the defendant must establish that the prosecution has deliberately distorted the judicial fact-finding process. *Id.* (citations omitted). We have yet to decide whether immunity represents a valid remedy for such conduct, *Talley*, 164 F.3d at 998, and we need not do so in this case because as was the case in *Talley*, "even assuming that the prosecutorial misconduct theory is cognizable in the Sixth Circuit, we are confident that [Defendant] has made no showing of such misconduct in this case." *Id.* Defendant cannot meet the high threshold required showing the availability of this exception. Furthermore, this theory allows the prosecution to refuse to grant immunity to a defense witness when it does not wish to hinder a future criminal prosecution of the witness. *Mohney*, 949 F.2d at 1402. Here, the prosecutor informed the district court that he intended to leave open the possibility of criminal liability in the event that Jeff Emuegbunem perjured himself or implicated himself in additional drug transactions.

---

[5] In *Talley*, we recognized that certain limited situations, in which the government selectively granted immunity to its own witnesses while denying immunity to defense witnesses, might deprive a defendant of a fair trial and so require the judicial remedy of compelled immunity. 164 F.3d at 997.

individuals have no standing to challenge violations of international treaties in the absence of a protest by the sovereigns involved.").

Nonetheless, the Supreme Court has recognized that treaties can create individually enforceable rights in some circumstances. *See, e.g.*, *United States v. Alvarez-Machain*, 504 U.S. 655, 667-68 (1992) (citing *United States v. Rauscher*, 119 U.S. 407 (1886)); *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 442-43 (1989). "Whether or not treaty violations can provide the basis for particular claims or defenses thus appears to depend upon the particular treaty and claim involved." *United States v. Lombera-Camorlinga*, 206 F.3d 882, 885 (9th Cir.) (en banc), *cert. denied*, 121 S. Ct. 481 (2000). Absent express language in a treaty providing for particular judicial remedies, the federal courts will not vindicate private rights unless a treaty creates fundamental rights on a par with those protected by the Constitution. *See, e.g.*, *Page*, 232 F.3d at 540-41. Acknowledging that the Vienna Convention "arguably confers on an individual the right to consular assistance following arrest," the Supreme Court has left open the question of whether the Vienna Convention creates an individual right enforceable by the federal courts. *Breard*, 523 U.S. at 376.[4]

---

[4] While doing so the Court has also puzzled over what the proper remedy for a violation of the Vienna Convention would be. "Even were Breard's Vienna Convention claim properly raised and proved, it is extremely doubtful that the violation should result in the overturning of a final judgment of conviction without some showing that the violation had an effect on the trial." *Breard*, 523 U.S. at 377 (citing *Arizona v. Fulminante*, 499 U.S. 279 (1991)). In *Breard*, the Court denied a petition for a writ of certiorari by enforcing a procedural default against a habeas petitioner's attempt to litigate a Vienna Convention claim on the day of his scheduled execution. Holding that the treaty did not trump the procedural rules of the federal courts, the Court out of an abundance of caution and in the face of lawsuits in the United States and the International Court of Justice brought by the government of Paraguay attempting to halt Breard's execution nonetheless considered in dicta whether Breard suffered any prejudice from the alleged violation. *Breard*, 523 U.S. at 374-75.

### C. Dismissal of the Indictment

With respect to Emuegbunem's claim that violation of his rights under the Vienna Convention requires dismissal of the indictment, we need not determine whether private individuals can enforce the treaty or whether Emuegbunem in fact suffered a violation of the rights conferred by the treaty. In *Page*, 232 F.3d at 540, we held that "although some judicial remedies may exist, there is no right in a criminal prosecution to have evidence excluded or an indictment dismissed due to a violation of Article 36." *See also United States v. Chaparro-Alcantara*, 226 F.3d 616, 618 (7th Cir.) (holding that dismissal of an indictment is not available to remedy a violation of the Vienna Convention), *cert. denied*, 121 S. Ct. 599 (2000); *United States v. Cordoba-Mosquera*, 212 F.3d 1194, 1196 (11th Cir. 2000) (per curiam) (absent a showing of prejudice a violation of the Vienna Convention cannot be remedied through dismissal of the indictment), *cert. denied*, 121 S. Ct. 893 (2001); *United States v. Li*, 206 F.3d 56, 66 (1st Cir.) (en banc) (dismissal of indictment is not an available remedy), *cert. denied*, 121 S. Ct. 379 (2000). Even if Defendant has suffered a violation of his rights under the Vienna Convention and even if he can enforce those rights in federal court, *Page* forecloses dismissal of the indictment as a remedy.

### D. Reversal of the Conviction

In *Page* we addressed only the availability of suppression of evidence or dismissal of an indictment as remedies to redress a violation of the Vienna Convention. Accordingly, we must turn to consideration of whether reversal of a conviction can remedy a violation of the Vienna Convention. As a threshold matter, the government contends that the Vienna Convention does not create rights individually enforceable in the federal courts. We agree.

Confronted in recent years with numerous claims based upon the Vienna Convention without the benefit of a definitive statement from the Supreme Court, federal courts whenever possible have sidestepped the question of whether

his defense is subject to harmless error analysis. *United States v. Foster*, 128 F.3d 949, 953 & n.4 (6th Cir. 1997).

As a threshold matter the parties dispute whether any agent of the United States interfered with Defendant's rights. Defendant contends that the United States bears responsibility for the actions of the officers at the Wayne County jail who discussed Jeff Emuegbunem's testimony with him, while the United States maintains that jail officials are independent contractors who make their own decisions about conditions of confinement. We express no opinion whether on the facts of this case the actions of the Wayne County turnkeys are attributable to the United States. Even if they are, the record shows no *substantial* interference with Defendant's right to call his brother as a witness in his defense; at most this record shows some ill-advised and inconsequential interference with that right. Any interference is insubstantial on these facts because Jeff Emuegbunem's attorney informed him that the Wayne County jailers could not initiate further criminal proceedings against him. Additionally, the district court judge herself reinforced the explanation given by Jeff Emuegbunem's attorney and sought further assurances from the proffered witness himself that his decision not to testify derived from concerns about his exposure to potential criminal liability based upon questions that the prosecution and defense wished to pose, rather than from the idle threats of his jailers. These assurances allowed the district court to conclude that "I did not have the impression at the trial stage that Mr. Jeff Emuegbunam was being forced or threatened to get him not to testify."

To the extent that Defendant challenges the decision of the prosecution not to give his brother immunity in exchange for his testimony, such a claim is not cognizable. "No court has authority to immunize a witness." *Pillsbury Co. v. Conboy*, 459 U.S. 248, 261 (1983). *See also United States v. Talley*, 164 F.3d 989, 997 (6th Cir.) ("We have consistently held that a district court is without authority to either grant immunity to a witness who asserts his Fifth Amendment privilege against self incrimination or to force the government to do

Amendment and he was not threatened and harassed by the Government."

On appeal the United States argues that Defendant must present this claim to the district court through a Rule 29 or Rule 33 post-trial motion to preserve it for appeal, but has cited no authority for this proposition. Our leading case on governmental intimidation of a defense witness, *United States v. Thomas*, 488 F.2d 334 (6th Cir. 1973) (per curiam), does not require such a step to preserve the issue for appellate review so long as the defendant has sufficiently raised and presented the matter to the district court in the first instance. Accordingly, because Emuegbunem argued to the district court that the government's conduct interfered with his ability to present his defense, we conclude that Defendant has preserved this issue for appellate review.

A defendant's right to present his own witnesses to establish a defense constitutes a fundamental element of due process and is protected by the Compulsory Process Clause of the Sixth Amendment. *Washington v. Texas*, 388 U.S. 14, 19 (1967). Various prosecutorial and judicial actions aimed at discouraging defense witnesses from testifying deprive a defendant of this right. *See, e.g.*, *Webb v. Texas*, 409 U.S. 95, 98 (1972) (per curiam) (reversing a conviction when the trial judge severely admonished the sole witness proffered by the defense who declined to testify as a result); *Thomas*, 488 F.2d at 336 (reversing a conviction obtained after a Secret Service agent in an *ex parte* communication advised a defense witness of possible prosecution if he testified). Neither *Webb* nor *Thomas*, however, "stand[s] for the proposition that merely warning a witness of the consequences of perjury demands reversal." *United States v. Pierce*, 62 F.3d 818, 832 (6th Cir. 1995) (citing *United States v. Smith*, 997 F.2d 674, 679-80 (10th Cir. 1993)). For this reason governmental conduct must amount to a substantial interference with a witness's free and unhampered determination to testify before we will find a violation of due process or the Sixth Amendment. *Id.* at 833 (citing *Smith*, 997 F.2d at 680). Even when such interference occurs, a violation of a defendant's right to call witnesses in

the treaty creates individual rights—typically by concluding that remedies such as suppression of evidence or dismissal of an indictment are not available even if the treaty creates individual rights. *See, e.g.*, *United States v. Santos*, 235 F.3d 1105, 1108 (8th Cir. 2000); *Page*, 232 F.3d at 540; *United States v. Lawal*, 231 F.3d 1045, 1048 (7th Cir. 2000), *cert. denied*, 121 S. Ct. 1165 (2001); *Chaparro-Alcantara*, 226 F.3d at 621; *Lombera-Camorlinga*, 206 F.3d at 885; *Li*, 206 F.3d at 66. On other occasions courts have concluded that a defendant must show prejudice to establish a violation of the Vienna Convention. *See, e.g.*, *United States v. Minjares-Alvarez*, ___ F.3d ___, 2001 WL 848611, at *6 (10th Cir. July 27, 2001); *United States v. Chanthadara*, 230 F.3d 1237, 1256 (10th Cir. 2000), *petition for cert. filed*, No. 00-9757 (May 2, 2001); *Cordoba-Mosquera*, 212 F.3d at 1196; *United States v. Pagan*, 196 F.3d 884, 890 (7th Cir. 1999); *United States v. Ademaj*, 170 F.3d 58, 67-68 (1st Cir. 1999). One circuit has held that the Vienna Convention does not establish any judicially enforceable right of consultation between a detained foreign national and the consular representatives of his nation. *United States v. Jimenez-Nava*, 243 F.3d 192, 198 (5th Cir.), *cert. denied*, 121 S. Ct. 2620 (2001). *See also Santos*, 235 F.3d at 1109 (Beam, J., concurring) (concluding that the Vienna Convention does not confer on private citizens rights enforceable in federal court); *Li*, 206 F.3d at 66-67 (Selya, J. & Boudin, J., concurring) (same). No federal appellate court has yet accepted a claim based upon violations of the treaty.

"In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning." *Alvarez-Machain*, 504 U.S. at 665 (citing *Air France v. Saks*, 470 U.S. 392, 397 (1985), and *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 11 (1936)). *See also Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 534 (1991); *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 699 (1988). Of the seventy-nine articles of the Vienna Convention, only Article 36 arguably protects individual non-consular officials. *Jimenez-Nava*, 243 F.3d at 196. The argument that the treaty confers rights upon criminal defendants who are foreign

nationals originates in the language of individual rights that appears throughout the Article among the treaty's protections for the ability of the consular officials of a sending State to communicate with a detained national. *See, e.g.*, Vienna Convention art. 36, § 1(a) ("Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State."); § 1(b) ("[Arresting] authorities shall inform the person concerned without delay of his rights under this sub-paragraph."). Yet the Preamble to the Vienna Convention expressly disclaims the creation of any individual rights: "[T]he purpose of such privileges and immunities is *not to benefit individuals* but to ensure the efficient performance of functions by consular posts on behalf of their respective States." Vienna Convention, 21 U.S.T. at 79, 596 U.N.T.S. at 262 (emphasis added). Similarly, Chapter II of the treaty, in which Article 36 appears, concerns the privileges and immunities of consular officers, not detained foreign nationals. Moreover, consistent with the background presumption against implying personal rights in international treaties, the rights contained in Article 36 belong to the party states, not individuals.

> Of course, there are references in the [treaty] to a "right" of [consular] access, but these references are easily explainable. The contracting States are granting each other rights, and telling future detainees that they have a "right" to communicate with their consul is a means of implementing the treaty obligations *as between States.* Any other way of phrasing the promise as to what will be said to detainees would be both artificial and awkward.

*Li*, 206 F.3d at 66 (Selya, J. & Boudin, J., concurring). Accordingly, we conclude that the Vienna Convention does not create in a detained foreign national a right of consular access.

To the extent the treaty admits of any ambiguity on the question, nontextual sources, "such as a treaty's ratification history and its subsequent operation," *United States v. Stuart*,

treatment in detention. Both Defendant and the prosecution informed the court of their intention to question Jeff Emuegbunem about his dealings with Player in other drug transactions. For this reason the district court concluded that Jeff Emuegbunem had properly asserted his Fifth Amendment privilege against self-incrimination and discharged him from testifying. With respect to his treatment at the Wayne County jail, the district court found that although officers may have mistreated Jeff Emuegbunem nothing rose to the level of a threat to his life. During these proceedings, Jeff Emuegbunem's attorney made comments that indicated that Jeff had unsuccessfully requested immunity to testify on behalf of his brother.

Following his conviction Defendant included the government's intimidation of his brother as a ground for relief in his motion for judgment of acquittal or, in the alternative, for a new trial. This intimidation, Defendant asserted, deprived him of his Fifth Amendment due process right and his Sixth Amendment rights to compulsory process and a fair trial. In doing so Defendant summarized the matters as to which his brother would have testified:

> He volunteered to testify to the fact that Player had lied about the source of the heroin which was seized from him and that he did not solicit Player to pick-up heroin from Defendant in Canada . . . . Jeff's testimony would have corroborated Player's regarding the fact that Defendant was not the individual whom Player referred to as CHUCK in the tape recorded conversation between Jeff, Player, and [the undercover customs agent] . . . . It would have also revealed that the $12,000 which Uche (phonetic Oochie) CHUCK had instructed him to collect from Player, did not involve Defendant.

Although for the reasons already discussed, the district court found that Defendant had filed this motion in an untimely fashion, the court nonetheless denied the motion on the merits because "Jeff Emuegbunem properly took the Fifth

When Defendant's trial resumed on September 20, 1999, Jeff Emuegbunem's attorney appeared and reported the results of his investigation:

His life was never threatened. He admitted to me that one of the sheriffs over there, one of the turn keys, so to speak, had told him that the sheriff deputies thought that he was a snitch, and that he had brought drugs into the country, and that he was here to lie for his brother, and that there would be new charges brought if he did that....

[M]y understanding of what he told me that's what he was complaining about was that he felt that was a threat, when the sheriff told him he was bringing drugs into the country, and that he would—and that he was here to lie for his brother....

Looking at my notes, he also was put into a segregation unit. I could not find out why he was put into segregation. He was there for about a week. He didn't like that. He didn't get a shower. I guess the cold water wasn't running, the hot water wasn't running, and they didn't give him a toothbrush. And, that is—what I can put on the record, what I learned from this fellow is that, *it was his perception that he was threatened; there was nobody threatening him*. And, most importantly, there was no other inmate threatening him.

(Emphasis added.) During this investigation Jeff Emuegbunem's attorney assured him that sheriffs do not bring perjury charges. As a result of his investigation, Jeff Emuegbunem's attorney formed the opinion that the treatment of his client in the Wayne County jail was not responsible for his refusal to testify.

When Defendant called his brother to testify on his behalf, Jeff Emuegbunem declined to do so. As reasons for not testifying, he explained that he feared for his life and worried about being charged with additional drug offenses if he testified. Otherwise Jeff Emuegbunem corroborated his attorney's account of his conditions of confinement and

489 U.S. 353, 366 (1989), dispel any doubt about whether the Vienna Convention creates individual rights. In resolving doubts about the interpretation, "the construction of a treaty by the political department of the government, while not conclusive upon courts called upon to construe it, is nevertheless of weight." *Factor v. Laubenheimer*, 290 U.S. 276, 295 (1933). *See also El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 168 (1999) ("Respect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty."); *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961) ("While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight.").

Since 1970 the State Department has consistently taken the view that the Vienna Convention does not create individual rights. *Li*, 206 F.3d at 63-64. *See also Jimenez-Nava*, 243 F.3d at 197; *Lombera-Camorlinga*, 206 F.3d at 887-88. In the view of the State Department, "the only remedies for failures of consular notification under the Vienna Convention are diplomatic, political, or exist between states under international law." *Page*, 232 F.3d at 541 (quoting *Li*, 206 F.3d at 63) (alterations omitted). This position accords with the view of the Department and the Senate during the ratification proceedings. *Li*, 206 F.3d at 64-65. In practice the parties to the Convention have attempted to remedy violations of Article 36 through investigations and apologies. "The State Department indicates that it has historically enforced the Vienna Convention itself, investigating reports of violations and apologizing to foreign governments and working with domestic law enforcement to prevent future violations when necessary." *Lombera-Camorlinga*, 206 F.3d at 886. In turn "[m]any, if not most, of the countries with which the United States raises concerns that consular notification obligations have been violated with respect to U.S. citizens will undertake to investigate the alleged violation and, if it is confirmed, to apologize for it and undertake to prevent future recurrences." *Li*, 206 F.3d at 65. Apparently, no country remedies violations of the Vienna

Convention through its criminal justice system. *Id.* "These practices evidence a belief among Vienna Convention signatory nations that the treaty's dictates simply are not enforceable in a host nation's criminal courts[.]" *Id.* at 66.

In support of his argument that the Vienna Convention creates individually enforceable rights, Emuegbunem cites *Faulder v. Johnson*, 81 F.3d 515 (5th Cir. 1996), and *Breard v. Pruett*, 134 F.3d 615 (4th Cir. 1998). This reliance is misplaced. In *Faulder*, the Fifth Circuit stated that the Vienna Convention "requires an arresting government to notify a foreign national who has been arrested, imprisoned or taken into custody or detention of his right to contact his consul." 81 F.3d at 520. Although state authorities admitted that they had failed to comply with the Vienna Convention, the court affirmed a capital murder conviction because on the facts presented there the violation did not merit reversal of the conviction. *Id*. Subsequently, the Fifth Circuit explained that its ruling in *Faulder* had not expressed a view on the question of whether the Vienna Convention confers rights enforceable by individuals. *Flores v. Johnson*, 210 F.3d 456, 457-58 (5th Cir.) (per curiam), *cert. denied*, 121 S. Ct. 445 (2000).

> We do not read our opinion in *Faulder* as recognizing a personal right under the Convention. Rather, the panel dispatched the claim with its conclusion that any violation was harmless. Any negative implication inherent in rejecting the claim as harmless lacks sufficient force to support a contention that the panel held that the Convention created rights enforceable by individuals. While we conclude that *Faulder* has not decided the question, we do not reach its merits because at best Flores's assertion is *Teague* barred.

*Id.* at 457. Accordingly, after *Flores* whether the Vienna Convention created individual rights remained an open question in the Fifth Circuit, *Jimenez-Nava*, 243 F.3d at 195 n.2 (concluding in the wake of *Faulder* and *Flores* that the question was one of first impression in the circuit), and in

time or the motion for judgment of acquittal and Emuegbunem did not move for a judgment of acquittal at the close of the prosecution's case or at the close of all the evidence, we review only for a manifest miscarriage of justice Defendant's challenge to the sufficiency of the evidence supporting his conviction. *See United States v. Swidan*, 888 F.2d 1076, 1080 (6th Cir. 1989) (noting that a defendant's failure to preserve his right to challenge the sufficiency of the evidence allows appellate review only for "a manifest miscarriage of justice") (quoting *United States v. Faymore*, 736 F.2d 328, 334 (6th Cir. 1984)). In this case, the record demonstrates that considerable circumstantial evidence in addition to the testimony of Player links Emuegbunem to the crime. Because Defendant has demonstrated no manifest injustice we reject his challenge to the sufficiency of the evidence.

## VI. Prosecutorial Misconduct

### A. Interference with the Right to Present a Defense

Defendant raises on appeal several claims of prosecutorial misconduct. First, he alleges that the government interfered with his right to call his brother, Jeff Emuegbunem, to testify at his trial. For his role in the instant offense, Jeff Emuegbunem received a sentence of forty-six months' imprisonment pursuant to the terms of a plea agreement. Shortly after his trial had commenced, Defendant informed the district court that his brother, whom the marshals had transported from the federal prison in North Carolina where he was serving his sentence, to the Wayne County jail for the pendency of the trial, was being held in a cell without water so that he could neither bathe nor brush his teeth. Furthermore, Defendant, who was also housed at the Wayne County jail, represented that his brother "wants to go back, that he has noticed some harassment that he will not be able to testify again because he is scared of his life." In response to these allegations, the district court directed Jeff Emuegbunem's attorney to investigate the conditions at the Wayne County jail.

officials on October 1, 1999, he timely filed it with the court. This argument fails for two reasons. First, *Houston's* mailbox rule does not apply to Rules 29 and 33. "[T]he court may not extend the time for taking any action under Rules 29, 33, 34 and 35, except to the extent and under the conditions stated in them." FED. R. CRIM. P. 45(b). The plain text of the Rules simply does not permit the filing of a motion for judgment of acquittal or for a new trial more than seven days after discharge of the jury unless within that seven-day period the district court enlarges the time for doing so. *See United States v. Hocking*, 841 F.2d 735, 736 (7th Cir. 1988) ("Rule 45(b) means what it says.") (citations omitted). *See also Tapia-Ortiz v. Doe*, 173 F.3d 150, 152 n.1 (2d Cir. 1999) ("*Houston* does not apply, of course, when there is a specific statutory regime to the contrary.") (citation omitted). In *Carlisle* the Supreme Court recognized as much:

> There is simply no room in the text of Rules 29 and 45(b) for the granting of an untimely postverdict motion for judgment of acquittal, regardless of whether the motion is accompanied by a claim of legal innocence, is filed before sentencing, or was filed late because of attorney error.

517 U.S. at 421.

In any event, the district court did not extend the period for filing the motion for judgment of acquittal during the seven-day period established by Rules 29(c) and 33. Even if Emuegbunem timely filed the motion for an extension of time, the district court's failure to grant it caused the seven-day period to expire. *Carlisle*, 517 U.S. at 421 ("[A] motion for judgment of acquittal must be filed, either within seven days of the jury's discharge, or within an extended period fixed by the court during that 7-day period."); *Davis*, 992 F.2d at 639-40 ("Rule 45(b) prohibits the court from extending the time for taking any action under Rule 29 and Rule 33 in a manner inconsistent with those rules.").

Because the district court correctly concluded that it lacked jurisdiction to entertain either the motion for an extension of

---

*Jimenez-Nava* the court resolved the issue adversely to the position advocated by Defendant. *Id*. at 198.

Like *Faulder*, the Fourth Circuit's opinion in *Breard* simply attempts a description of the Vienna Convention and takes no position on the rights and remedies of criminal defendants in the United States who are foreign nationals. *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998) (setting forth Breard's argument that the court should overturn his conviction and death sentence because the "authorities failed to notify him that, as a foreign national, he had the right to contact the Consulate of Argentina or the Consulate of Paraguay pursuant to the Vienna Convention"), *cert. denied*, 523 U.S. 371 (1998) (per curiam). Two features of the Fourth Circuit's decision in *Breard* confirm this conclusion. First, noting that Breard had failed to raise this claim in state court, the Fourth Circuit concluded that he had procedurally defaulted the claim and that he could not show cause to excuse the default. Accordingly, the court declined to consider the merits of Breard's Vienna Convention claim. *Id*. at 619-20. Second, the court quoted *Murphy v. Netherland*, 116 F.3d 97, 100 (4th Cir. 1997), in which it rejected an argument that a habeas petitioner's Vienna Convention claim was so novel that he could not have raised it in state court proceedings, because a reasonably diligent attorney should have discovered "the existence and applicability (*if any*) of the Vienna Convention." *Breard*, 134 F.3d at 620 (emphasis added). This procedural posture and the quotation from *Murphy* demonstrate that the Fourth Circuit in *Breard* took no position on the question of whether the Vienna Convention creates individual rights.

For the foregoing reasons, we hold that the Vienna Convention does not create a right for a detained foreign national to consult with the diplomatic representatives of his nation that the federal courts can enforce. A contrary conclusion risks aggrandizing the power of the judiciary and interfering in the nation's foreign affairs, the conduct of which the Constitution reserves for the political branches. *See Lombera-Camorlinga*, 206 F.3d at 887 ("The addition of

a judicial enforcement mechanism contains the possibility for conflict between the respective powers of the executive and judicial branches."). Significantly, the Supreme Court has twice held that the Vienna Convention does not provide a signatory nation a private right of action in the federal courts to seek a remedy for a violation of Article 36. *Federal Republic of Germany v. United States*, 526 U.S. 111, 111-12 (1999) (per curiam); *Breard*, 523 U.S. at 377. If a foreign sovereign to whose benefit the Vienna Convention inures cannot seek a judicial remedy, we cannot fathom how an individual foreign national can do so in the absence of express language in the treaty.

### III. The Motion to Strike

Emuegbunem moved to strike the alias "Chuck" from the indictment both because "Defendant is a traditional Chief and his culture forbids the use of aliases as a Chief," and because, consistent with the defense's mistaken-identity theory, he believes that the prosecution used the alias "Chuck" to link him to Player notwithstanding the government's possession of his passport and other documents identifying him as "Chuks Emuegbunem." Defendant also argued that the district court should strike the entire indictment because the government indicted him as "Chucks Emuegbunam a/k/a 'Chuck.'" In denying the motion to strike, the district court accepted the representation of the prosecutor that the indictment contained the alias because Player would testify that he knew the individual from whom he received the heroin as "Chuck" and that the Defendant was that person. For the court, this explanation sufficed to demonstrate that the government used the alias in the indictment to connect Emuegbunem to the charged offense.

The decision whether to strike language from an indictment rests within the sound discretion of the district court. *United States v. Kemper*, 503 F.2d 327, 329 (6th Cir. 1974). We "strongly disapprove the practice of including aliases in indictments . . . . Only when proof of an alias is relevant to identifying the defendant should a court allow its inclusion in

ascertaining whether a defendant timely filed a motion for judgment of acquittal or a new trial. *United States v. Davis*, 992 F.2d 635, 639 (6th Cir. 1993).

For a district court to have jurisdiction over a motion made under Rule 29 or Rule 33, the movant must comply with the seven-day period of the Rules. *See, e.g.*, *United States v. Gaydos*, 108 F.3d 505, 512 (3d Cir. 1997); *United States v. Calderon*, 86 F.3d 200, 200 (11th Cir. 1996); *United States v. Beran*, 546 F.2d 1316, 1319 n.1 (8th Cir. 1977). In *Carlisle v. United States*, 517 U.S. 416 (1996), the Supreme Court strictly construed the time limits set forth in Rule 29(c) in affirming this court's judgment in *United States v. Rupert*, 48 F.3d 190 (6th Cir. 1995) (holding that a district court lacks jurisdiction over a post-trial motion for judgment of acquittal filed one day outside the Rule's seven-day period). The Court held that a motion under Rule 29(c) "must be filed, either within seven days of the jury's discharge, or within an extended period fixed by the court during that 7-day period." *Carlisle*, 517 U.S. at 421.

Under the rules for computing time in Rule 45(a), the seven-day period for filing a motion under Rule 29(c) or Rule 33 expired on October 4, 1999. Defendant filed both his motion for a new trial and his motion for an extension of time after this date. Accordingly, the district court correctly concluded that it lacked jurisdiction to entertain either motion. *See Rupert*, 48 F.3d at 192 ("Under Rule 29, it is beyond the court's jurisdiction to grant an untimely motion for acquittal."). *See also United States v. Sheppard*, 149 F.3d 458, 462-63 (6th Cir. 1998) (concluding on the authority of *Carlisle* that the district court lacked jurisdiction over an untimely Rule 29(c) motion).

Emuegbunem argues that the "mailbox rule" recognized in *Houston v. Lack*, 487 U.S. 266, 270 (1988) (holding that a pro se habeas petitioner "files" a notice of appeal upon delivery of it to prison officials for forwarding by mail to the clerk of courts), applies to his case with the result that when he tendered his motion for an extension of time to prison

On October 6, 1999, the district court docketed a motion to extend the time for filing the motion for a new trial. Defendant dated the motion for an extension of time October 1, 1999, but the envelope in which prison officials sent it to the clerk of the district court bears a postal stamp dated October 5, 1999. On October 18, 1999, Defendant filed a motion for judgment of acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure or, in the alternative, for a new trial pursuant to Rule 33. At a subsequent hearing, the district court concluded that it lacked jurisdiction over the motion for an extension of time and the motion for a new trial since Emuegbunem did not file either within seven days of the jury's verdict. Defendant contends that the district court erred in so concluding.

We review the denial of a motion for judgment of acquittal de novo, but will affirm the district court if the evidence, viewed in the light most favorable to the government, would allow a rational trier of fact to find the defendant guilty beyond a reasonable doubt. *United States v. Harrod*, 168 F.3d 887, 889-90 (6th Cir. 1999) (quoting *United States v. Canan*, 48 F.3d 954, 962 (6th Cir. 1995)). Rule 29(c) provides:

> **Motion After Discharge of Jury.** If the jury returns a verdict of guilty or is discharged without having returned a verdict, a motion for judgment of acquittal may be made or renewed within 7 days after the jury is discharged or within such further time as the court may fix during the 7-day period. If a verdict of guilty is returned the court may on such motion set aside the verdict and enter judgment of acquittal. If no verdict is returned the court may enter judgment of acquittal. It shall not be necessary to the making of such a motion that a similar motion has been made prior to the submission of the case to the jury.

Rule 33 employs the same seven-day period for seeking a new trial, except in cases of newly discovered evidence. Accordingly, we treat the Rules similarly for purposes of

the indictment and its subsequent introduction at trial." *United States v. Wilkerson*, 456 F.2d 57, 59 (6th Cir. 1972) (per curiam). "It is clear, however, that the use of an alias in an indictment and in evidence is permissible if it is necessary to connect the defendants with the acts charged." *United States v. Hines*, 955 F.2d 1449, 1454 (11th Cir. 1992) (quotation omitted). *See also United States v. Moya-Gomez*, 860 F.2d 706, 762 (7th Cir. 1988); *United States v. Clark*, 541 F.2d 1016, 1018 (4th Cir. 1976) (per curiam).

We think that the district court did not abuse its discretion by denying Defendant's motion to strike. Before the district court and on appeal the government has erroneously maintained that the evidence of record identifies the Defendant as "Chuck." For example, the government states that the index card found on Player upon his arrest listed the name "Chuck," when in fact the name on the card was "Chucks." Although the government has incorrectly characterized the evidence with respect to the names by which Defendant is known, the record evinces considerable uncertainty regarding Defendant's identity. In the transcript of the recorded conversation between Player and Jeff Emuegbunem, the conspirators refer to "Chuck," not "Chucks" or "Chuks," and the hotel registry lists the occupant of Room 1403 as "E. Chucks." Significantly, at trial Player referred to his supplier as "Chuck," and testified that he knew the Defendant by the name "Chuck." Accordingly, the inclusion of the alias "Chuck" in the indictment served the proper purpose of identifying the Defendant. *Wilkerson*, 456 F.2d at 59.

Emuegbunem's argument that the misspelling of his name vitiates the indictment is likewise unavailing. "A name need not be correctly spelled in an indictment, if substantially the same sound is preserved." *Faust v. United States*, 163 U.S. 452, 454 (1896). *See also Thibodeau v. United States*, 361 F.2d 443, 444 (5th Cir. 1966) (per curiam); *Cox v. State*, 608 S.W.2d 219, 219 (Tex. Crim. App. 1980) ("If the names may be sounded alike without doing violence to the power of the letters found in the variant orthography, or if the name as

stated be idem sonans with the true name, the variance and misspelling is immaterial.") (quotation omitted). Because the indictment of "Chucks Emuegbunam" substantially preserves the same sound as Defendant's true name, Chuks Emuegbunem, *Faust* disposes of this argument.

## IV.  Admissibility of Testimony under the Co-Conspirator Exception to the Hearsay Rule

Rule 801(d)(2)(E) of the Federal Rules of Evidence defines statements made by a co-conspirator as "not hearsay" when made during the course and in furtherance of the conspiracy. To admit a co-conspirator statement under Rule 801(d)(2)(E), the government must first establish by a preponderance of the evidence that (1) the conspiracy existed, (2) the defendant was a member of the conspiracy, and (3) the co-conspirator's statements were made in furtherance of the conspiracy. *United States v. Rios*, 842 F.2d 868, 872 (6th Cir. 1988) (per curiam) (citations omitted). "The district court is required to make a finding that the government has met its burden, but may admit the statements in question subject to a later ruling that this burden was met." *United States v. Moss*, 9 F.3d 543, 549 (6th Cir. 1993) (citing *United States v. Vinson*, 606 F.2d 149, 153 (6th Cir. 1979)).  This finding is a factual determination subject to review under the clearly erroneous standard. *United States v. Gessa*, 971 F.2d 1257, 1261 (6th Cir. 1992) (en banc) (citing *Mahoney v. United States*, 831 F.2d 641, 645 (6th Cir. 1987)).  Co-conspirator statements themselves "shall be considered but are not alone sufficient to establish" the existence of a conspiracy or a defendant's participation in it.  FED. R. EVID. 801(d)(2)(E).  *See also Bourjaily v. United States*, 483 U.S. 171, 180-81 (1987); *United States v. Tocco*, 200 F.3d 401, 420 (6th Cir. 2000); *Vinson*, 606 F.2d at 153.  Admission of statements as "not hearsay" under Rule 801(d)(2)(E) based on these threshold determinations presents a question of law that we review de novo. *Gessa*, 971 F.2d at 1261 (citations omitted).

When the government sought to introduce the tape-recorded conversation between Player and Jeff Emuegbunem at the

Detroit Metropolitan airport, Defendant objected on the grounds that he was not the "Chuck" whom Player and his brother discussed, Player had ceased to be a co-conspirator once he was arrested and began cooperating with federal agents, and the statements in the conversation did not further the conspiracy.  In overruling the objection the district court concluded that the prosecution had met its burden of showing that a conspiracy existed of which Defendant was a member and that the proffered statements furthered the conspiracy. The court found a conspiracy  based on Player's testimony, the index card found on Player's person upon his arrest, and the content of the recorded conversation itself.  In addition to Player's testimony, the court relied on the hotel records to establish that Defendant was a member of the conspiracy. Because the proffered conversation concerned payment for the heroin already acquired in Canada, the court viewed the statements as made in furtherance of the conspiracy.

The record supports each of these preliminary determinations made by the district court, and none of them is clearly erroneous.  Further, as the district court concluded, the conspiracy continued until Player's suppliers received full payment for the heroin.  Player's arrest and cooperation with authorities in no way alter this conclusion. "[W]here, as here, the unarrested coconspirators are still capable of perpetuating the ongoing conspiracy, the statements made by them to the arrested conspirator are admissible for Rule 801(d)(2)(E) purposes, even when the arrested conspirator was acting 'under the direction and surveillance of government agents to obtain evidence against the coconspirators.'" *United States v. Ramos*, 861 F.2d 461, 465 (6th Cir. 1988) (quoting *United States v. Hamilton*, 689 F.2d 1262, 1269 (6th Cir. 1982)).  For these reasons, we hold that the district court properly admitted the evidence pursuant to Rule 801(d)(2)(E).

## V.  Motion for Judgment of Acquittal

On September 23, 1999, the jury returned a verdict of guilty against Emuegbunem.  That day Emuegbunem informed the district court that he intended to file a motion for a new trial.