RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0188p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————————

UNITED STATES OF AMERICA,

                *Plaintiff-Appellee,*

    *v.*

RANDY WAYNE SPRINGER,

                *Defendant-Appellant.*

> No. 08-6381

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 07-00261-001—Thomas A. Wiseman, Jr., District Judge.

Decided and Filed: June 29, 2010

Before: GUY, BOGGS, and SUTTON, Circuit Judges.

—————————————

**COUNSEL**

**ON BRIEF:** Michael J. Flanagan, LAW OFFICE, Nashville, Tennessee, for Appellant. Addison Thompson, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee.

—————————————

**OPINION**

—————————————

BOGGS, Circuit Judge. Randy Wayne Springer, a member of the United States Army, took a live rocket home from Fort Campbell and kept it beside the central vacuuming unit in his garage for over four years. He concedes that he did not have authority to do so. After his then-wife alerted police, he was convicted of possessing an unregistered firearm, in violation of 26 U.S.C. §§ 5861(d) and 5871. He then launched this appeal, arguing that the evidence presented at trial was insufficient to support a finding of guilt. The gist of his argument is that, because he was a soldier, the rocket was always in the possession and under the control of the United States. This contention fails, and we therefore affirm.

1

I

Springer's mostly commendable career in the United States Army has taken him into combat areas on four separate occasions, and he has been the recipient of numerous decorations, including a Meritorious Service Medal, six Army Commendation Medals, and four Army Achievement Medals. As he testified at trial, "[r]ight up until these charges were pending, all my Good Conduct Medals had arrived like they were supposed to. I have never been in trouble. My record has been flawless." *Ibid.* Unfortunately, that changed.

In June 2003, Springer served as a noncommissioned armament officer at Fort Campbell, home to the United States Army's 160th Special Operations Aviation Regiment, also known as the Night Stalkers. Springer's job was to maintain weapons systems on attack helicopters. During night training exercises on Fort Campbell's vast firing ranges, he would remain on the ground, where he and others replenished helicopters depleted of rockets, bullets, and gas. It was also part of Springer's responsibilities to "de-arm" helicopters that returned to the arming pad at the end of the night with unspent ammunition.

One evening, at the conclusion of training exercises, Springer noticed that a helicopter had been mistakenly returned to the hangar with an unfired high-explosive rocket. According to Springer's trial testimony, the rocket was supposed to have been transferred to ammunition personnel and transported back to the base's ammunition supply point ("ASP"), but somehow the rocket had been left in its pod on the helicopter. After calling the ASP and receiving no answer, Springer "made the decision to throw the rocket in the back of [his] car and drive it to the ASP and leave it with the ASP guys there." He admitted at trial that it was against regulations to place the rocket in a private vehicle, but it was late and he was tired. When he arrived at the ASP, no one was there. At that point, he decided to take the rocket to his home, which was not located on the base, and bring it back later.

When he got home that night, Springer placed the rocket against the wall in the back of his garage, but only after tearing out some wires so as to ensure that the device would not be detonated by static electricity. The following morning, he returned to the base without the rocket. That day, he learned he would imminently be deployed to Iraq, and within three days, he was overseas. He did not return the rocket prior to his deployment. Nor did he return it after his deployment, which ended in October 2003. In fact, the rocket remained

in his garage for what he described as "countless hundreds of days [on which he] could have taken it back."

On October 19, 2007, the rocket was finally removed from its spot adjacent to Springer's central vacuuming unit. The events leading to the rocket's removal began when Springer's then-wife phoned local authorities to discuss an order of protection she had taken out against him. During the call, she disclosed the rocket's presence to police, who later contacted military personnel to secure it. An explosive ordnance disposal technician was dispatched, and the rocket was returned to the ASP at Fort Campbell, precisely where it should have gone in the first place.

Springer was subsequently indicted for possession of an unregistered firearm, in violation of 26 U.S.C. §§ 5861(d) and 5871. During his trial, he moved for a judgment of acquittal on the grounds that the evidence was insufficient to sustain a conviction. The motion was denied, as was a renewed motion filed subsequent to the jury's verdict. At sentencing, he received three years' probation. Additionally, the district court took note of Springer's generally admirable military history and permitted him to possess firearms, despite his conviction, during "his service in the Army."

Springer now appeals.

## II

The National Firearms Act, 26 U.S.C. §§ 5801 *et seq.*, is "an interrelated statutory system for the taxation of certain classes of firearms." *Haynes v. United States*, 390 U.S. 85, 87 (1968). The Act's purpose is to curb the proliferation of especially dangerous weaponry "identifiable generally and broadly, if not exclusively, with criminal activities." *United States v. Black*, 431 F.2d 524, 528 (6th Cir. 1970); *see also Haynes*, 390 U.S. at 87 n.4 (indicating that the Act's primary purpose "was to make it more difficult for the gangster element to obtain certain types of weapons"). Among the firearms covered by the Act are sawed-off shotguns, machine guns, and "destructive devices," such as bombs, grenades, and rockets. 26 U.S.C. § 5845(a), (f).

Two provisions of the Act are relevant to Springer's appeal. The first is § 5841, which sets forth the Act's registration requirements. Under § 5841(a), the Secretary of the

Treasury is required to "maintain a central registry of all firearms in the United States which are not in the possession or under the control of the United States." That registry is known as the National Firearm Registration and Transfer Record. *Ibid.*

The second pertinent provision is § 5861(d), which makes it "unlawful for any person . . . to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record[.]" To make out a violation, the government must establish that: (1) the defendant possessed a firearm; (2) the defendant knew of the firearm's characteristics; and (3) the firearm was not registered to him. *See Staples v. United States*, 511 U.S. 600, 602 (1994); *United States v. Freed*, 401 U.S. 601, 612 (1971) (Brennan, J., concurring in the judgment). The government is not required to prove that the defendant knew the weapon was unregistered. *See Freed*, 401 U.S. at 607 (opinion of the Court). Upon conviction, the defendant is subject to a fine of up to $10,000 or imprisonment of up to ten years, or both. 26 U.S.C. § 5871.

## III

Springer's sole argument is that the district court erred in denying his motion for acquittal because there was insufficient evidence to sustain a conviction under § 5861(d). In making this argument, he contends that there is an exception to § 5861(d) for possession of a firearm that is in the possession or under the control of the United States. He further contends that, because he was a soldier, "the rocket was always in the possession of the United States through [him]." Appellant's Br. at 9. Thus, according to Springer, the government failed to demonstrate that his possession of the rocket was illegal.

## A

We begin with Springer's claim that § 5861(d) contains an exception for possession of a firearm that is in the possession or under the control of the United States. Claims like this, which raise questions of statutory construction, are reviewed *de novo*. *Douglas v. Babcock*, 990 F.2d 875, 877 (6th Cir. 1993). In assessing such questions, the starting point is invariably the language of the statute. *Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 801 (6th Cir. 1995). If the language is unambiguous, we must give effect to its plain

meaning.  *Broadcast Music, Inc. v. Roger Miller Music, Inc.*, 396 F.3d 762, 769 (6th Cir. 2005).

Turning first to the text of the statute, we note that it may support Springer's cause. True, the language of § 5861(d) is unambiguously devoid of express exceptions, providing only that no individual can legally possess an unregistered firearm.  *Cf.* 18 U.S.C. § 922(o)(2)(A) (creating an exception to § 922(o)(1)'s blanket ban on machine gun possession for "possession by or under the authority of" the United States).  However, the language of § 5841(a) appears to create an implicit exception to § 5861(d).  Under § 5841(a), firearms "in the possession or under the control of the United States" are exempt from registration in the National Firearms Registration and Transfer Record. 26 U.S.C. § 5841(a). Because registration is a fundamental component of the regulatory scheme set forth in the National Firearms Act, Congress's decision to exempt government-owned firearms from registration can be interpreted to signify a broader purpose of granting the government unencumbered access to firearms.  In other words, it seems obvious that an exemption from registration entails a concomitant exemption from penalties arising out of unregistered possession.

Additionally, without a corresponding exception to § 5861(d), the language of § 5841(a) creates a problem.  As mentioned above, § 5841(a) provides for the creation of the National Firearms Registration and Transfer Record.  By definition, the Record includes only firearms "which are not in the possession or under the control of the United States."  26 U.S.C. § 5841(a); *see also United States v. Khatib*, 706 F.2d 213, 216 (7th Cir. 1983) (holding that firearms in the possession of the United States are "excepted from registration").  Under § 5861(d), it is illegal to possess a firearm that does not appear in the Record.  Thus, under a literal reading of the statutory text, no individual could legally possess a firearm that is in the possession or under the control of the United States.  That would be a manifestly absurd result.  There is no question that the federal government can legitimately possess and utilize firearms; the language of the statute assumes as much.  *See* 26 U.S.C. § 5841(a).  However, as an "abstract entity," the government "has no hand to write or mouth to speak . . . .  It speaks and acts only through agents, or more properly, officers." *The Floyd Acceptances*, 74 U.S. (7 Wall.) 666, 676 (1868).  Unsurprisingly, the government is also dependent on flesh-and-blood representatives to transport, maintain, and wield

firearms.  If those representatives cannot legally possess firearms, the government cannot legally possess firearms—at least not meaningfully.  Congress surely did not intend that outcome.

Luckily, there is a simple way of averting this scenario.  If § 5841(a) is read to create an implicit exception to § 5861(d)'s prohibition on unregistered possession, then federal agents are not vulnerable to prosecution for performing their firearm-related duties, and the government's ability to possess and employ firearms is not jeopardized.  Furthermore, this reading of the statute is fully consistent with Congress's avowed purpose in enacting the National Firearms Act, which, as noted above, is to prevent especially dangerous weapons from falling into the hands of the "gangster element."  *Haynes*, 390 U.S. at 87 n.4.  Accordingly, we hold that § 5861(d) does not prohibit possession of an unregistered firearm that is in the possession or under the control of the United States.  In so holding, we join the former United States Army Court of Military Review, which recognized that § 5861(d) "covers unregistered possession of all automatic firearms, except those under the possession or control of the United States."  *United States v. De Marco*, 41 C.M.R. 613, 614 (A.C.M.R. 1969).

Of course, given its justification, the exception is only available to those who receive or possess a firearm while acting as an *agent* of the United States.  The key to determining whether an individual is functioning as a federal agent, as opposed to a private citizen, is his authority to act on the government's behalf.  *See* Black's Law Dictionary 68 (8th ed. 2004) (Agents are those who are "authorized to act for or in place of another."); Webster's Third New International Dictionary 40 (1981) (defining an agent as "one that acts for . . . another by authority from him").  Thus, to obtain the benefit of the exception, one must have the authority, conferred upon him by the United States, to receive or possess a given firearm at a given time.  This standard ensures that only those who are furthering the aims of the United States, as determined by the government itself, are excluded from the reach of § 5861(d).

Springer urges a different construction of the exception.  He seems to suggest that, as a matter of law, soldiers are exempt from prosecution under § 5861(d) simply by virtue of their status as members of the armed forces.  It does not take a rocket scientist to see that this claim does not fly.  If Springer were correct, a soldier would face no consequences under

§ 5861(d) for stealing "large quantities of items such as Claymore anti-personnel mines, M-67 hand grenades, C-4 plastic explosives, T.N.T., dynamite, 35 mm. practice L.A.W.S. rockets, detonation devices, and tons of ammunition and other military supplies, including large shells such as 106 mm. and 90 mm. canisters." *United States v. Anderson*, 872 F.2d 1508, 1511 (11th Cir. 1989) (upholding the convictions of two active-duty soldiers under § 5861(d) for stealing the aforementioned ordnance). Obviously, an exception broad enough to permit such conduct would defy common sense.

B

The final question, then, is whether the evidence presented at Springer's trial supports the finding that he acted outside his authority in taking and keeping the rocket. "In reviewing a claim that the evidence at trial was insufficient to sustain a conviction, we consider 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Carter*, 465 F.3d 658, 664 (6th Cir. 2006) (quoting *United States v. Copeland*, 321 F.3d 582, 600 (6th Cir. 2003)). When conducting this inquiry, "[w]e are bound to make all reasonable inferences and credibility choices in support of the jury's verdict." *United States v. Hughes*, 895 F.2d 1135, 1140 (6th Cir. 1990) (citing *United States v. Stull*, 743 F.2d 439, 442 (6th Cir. 1984)).

Here, a reasonable juror could easily have found that Springer's possession of the rocket was unauthorized. Springer himself admitted that "no soldier is allowed to transport weapons and ammunition in a privately-owned [sic] vehicle." He also confirmed that "soldiers aren't authorized to store firearms and ammunition in their private residences." Additionally, he conceded that he could have taken the rocket back to base on "countless hundreds of days." He then admitted that "[t]he only reason why [he did not] was an ultimate act of procrastination on [his] part." On top of that, he verified that he never informed anyone in his chain of command that he had the rocket. From this testimony alone, we find that the evidence was sufficient to support the conclusion that Springer did not qualify for the exception to § 5861(d).

IV

For the foregoing reasons, we AFFIRM Springer's conviction.