**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0074n.06

**Nos. 11-6084, 11-6143**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
***Jan 16, 2013***
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff-Appellee,<br><br>v.<br><br>GRAY JORDAN and WILLIAM CAPERS JORDAN,<br><br>     Defendants-Appellants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE |

Before: NORRIS, GIBBONS, and DONALD, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** A jury in Tennessee convicted William Capers Jordan ("Capers") and Gray Jordan ("Gray") of conspiracy to distribute and possess with intent to distribute 1,000 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). Capers and Gray allege that the district court committed several errors at trial, that the district court improperly calculated Gray's sentence, that the prosecutor committed prosecutorial misconduct, that Capers received ineffective assistance of counsel, that there was insufficient evidence to support Capers's convictions, and that venue was improper to charge Capers with conspiracy to commit money laundering. For the following reasons, we affirm Capers's and Gray's convictions and sentences.

I.

James Michael West orchestrated the marijuana-trafficking and money-laundering conspiracies in which Capers and Gray participated. West bought marijuana in Tucson, Arizona, which was then delivered to Atlanta, Georgia, and eastern Tennessee. Gray's involvement in the conspiracy began around 1997. West testified that he paid Gray twenty-five dollars per pound and then later fifty dollars per pound to coordinate operations in Tucson. Gray was responsible for monitoring the quality of the marijuana, meeting drivers coming from the east, and assisting them in their return. Gray and West also rented a house in Tucson to store money and marijuana. West testified that Gray worked for him in Tucson until 2001 or 2002. Julia Newman, a coconspirator, testified that in April 2001, Gray and Newman drove from Tucson to Atlanta with at least 200 pounds of marijuana.

In 2000, Gray asked West if he was interested in jointly buying a piece of property in Hawaii. West agreed to do so, and he testified that they paid for the property with marijuana proceeds. Gray moved from Tucson to California, and he would visit the Hawaiian property for up to several months at a time. West testified that he gave Gray marijuana proceeds to improve the property.

Capers's participation in the conspiracy began around 2001 when he learned that West needed someone to drive to and from Arizona to deliver money and return with marijuana. Capers told West that his friend Melvin Skinner, known as "Big Foot," owned a trucking company and was available to make the deliveries. Initially, Capers did not reveal Skinner's identity to West, and West accepted Capers's offer. According to West, Skinner drove to Arizona eight to ten times and delivered an average of 850 to 1,000 pounds of marijuana on each trip. Upon return from Arizona,

Skinner would deliver the marijuana to a storage unit, and Capers would give West the key to the unit. West would then ask someone else to pick up the drugs. In 2002 or 2003, Skinner stopped delivering marijuana to Arizona because Capers believed that it was unsafe. However, in 2005, West wanted Skinner to drive for him again, so he met Capers and Skinner at Capers's home. According to West, this was the first time he met Skinner. West testified that Skinner's trucking company was bankrupt, but Skinner agreed to drive because West loaned him money to purchase a pickup truck. West paid Skinner approximately $100 per pound for delivering the marijuana, and Skinner shared this payment with Capers. Chris Shearer, a participant in the conspiracy and confidential informant, recorded conversations that he had with West. In one recorded phone conversation, West said to Shearer, "I think though overall, Capers is a pretty good guy, but I do think he's greedy. Like I found out the other day that he was getting a third of Big Foot's pay." The conspiracies ended when Melvin Skinner and his son were arrested on July 16, 2006. West was arrested shortly thereafter.

## II.

## A.

We first address Capers's arguments. Capers claims that the district court violated his right of confrontation when it prohibited him from cross-examining witnesses regarding their pagan beliefs and relationships. According to Capers, some of the witnesses "were intimately interconnected through time, space, and the pagan based relations they share with one another. Mike West was the head . . . of the pagan-based relations empire." Capers asserts that he wanted to show that the government's witnesses were West's followers and would say anything in court to corroborate West's testimony.

-3-

The Confrontation Clause of the Sixth Amendment provides that, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . . " U.S. Const. amend. VI. It guarantees a defendant "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1985).

Capers asserts that the court improperly limited the cross-examination of several witnesses, including Christopher Shearer, Joanne West, Julia Newman, James Michael West, and Mark Cort. In his appellate brief, Capers does not point to any specific line of questioning where the district court limited cross-examination. In his brief before the district court in support of an amended motion for judgment of acquittal or, in the alternative, for a new trial, he only quotes Joanne West's cross-examination. Accordingly, we find that Capers did not sufficiently develop his argument that the district court violated his right of confrontation as to the witnesses Christopher Shearer, Julia Newman, James Michael West, and Mark Cort. *See United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006) ("[I]t is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (quoting *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996)).

During cross-examination, Capers's counsel asked Joanne West, James Michael West's wife, the following questions:

Q. You talked something about a boogie. Isn't this a big party that 500 or so people go to?
A. Yes, it is.
Q. You have to have like special permission to get in?
A. Yes, it is.
Q. This is your group of friends, right?
A. It's an extended version.
Q. There is two Boogies. There is one like at after the fourth of July and one on Labor Day?
A. There are several.
Q. Okay. These are the people you associate with?
A. There were different groups.
Q. And there is a pagan group?
A. Yes, there is.
Q. Are you involved in that?
A. Yes, I am.
Court: Counsel, let me see you just a moment, please.
(A bench conference was held.)
Court: You may continue, counsel.

Capers claims that the court prevented him from showing the scope of the "pagan-based" connections of Joanne West to other conspirators. However, Capers failed to preserve his claim that the district court violated his right to confront Joanne West because he did not make an offer of proof as required by Federal Rule of Evidence 103(a)(2). This rule provides that a party may contest the exclusion of evidence only if such exclusion affects a substantial right of the party and the party "informs the court of its substance by an offer of proof, unless the substance was apparent from the context." Fed. R. Evid. 103(a)(2). Capers did not inform the district court of what testimony he intended—but was unable—to elicit from Joanne West. Moreover, the substance of the testimony Capers wanted to elicit from Joanne West was not obvious from the context.

Even if Capers had preserved this argument, it fails on the merits because the district court provided ample opportunity for Capers's counsel to cross-examine Joanne West. For example, Capers's counsel asked about why she did not reveal the extent of her involvement in the

conspiracies until after she pled guilty, about her loyalty to her husband, and about her desire to be with her child and not spend much time in jail. Through this questioning, Capers's counsel highlighted Joanne West's potential bias in favor of her husband. Co-defendants' counsel also extensively cross-examined Joanne West. Because the Confrontation Clause guarantees "effective cross-examination, not cross-examination that is effective in whatever way," *Fensterer*, 474 U.S. at 20, and because Capers was able to effectively cross-examine Joanne West, we find that the district court did not violate Capers's Sixth Amendment right of confrontation.

B.

Capers claims that the district court twice erred by admitting hearsay statements. First, Capers points to the testimony of Julia Newman, who West hired to transport drugs from Tucson to Atlanta. Newman testified that in July 2006, Capers called her at her home in Tennessee. Newman had not been in contact with Capers for a while, and he said that he was trying to reach West. Newman asked Capers why he needed West, and Capers responded "driver down." Newman testified that "driver down" meant that someone who was transporting marijuana for West had been arrested. Capers argues that because Newman and Capers had not spoken for a long time prior to this call, they were not coconspirators and therefore the coconspirator exception to the hearsay rule did not apply. Capers asserts that he was prejudiced by the "driver down" statement because the prosecutor referred to it in his closing argument. Second, Capers argues that the district court improperly admitted audio tapes of Melvin Skinner's conversation from jail with his wife, Shirley Skinner. According to Capers, Shirley Skinner was not a coconspirator and these conversations did not occur during and in furtherance of the conspiracy. Moreover, Capers asserts that he was prejudiced by admission of these statements but does not explain how he was prejudiced.

Because Capers did not object to admission of these statements during trial, we apply plain error review. *United States v. Swafford*, 385 F.3d 1026, 1028 (6th Cir. 2004). "To establish plain error, a defendant must show that: (1) an error occurred in the district court; (2) the error was obvious or clear; (3) the error affected defendant's substantial rights; and (4) this adverse impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Emuegbunam*, 268 F.3d 377, 406 (6th Cir. 2001). The court did not plainly err in admitting Capers's "driver down" statement as not hearsay because it was offered against Capers. *See* Fed. R. Evid. 801(d)(2)(A) ("A statement that meets the following conditions is not hearsay: . . . The statement is offered against an opposing party and . . . was made by the party in an individual or representative capacity . . . .").

The government argues that the statements made by Skinner to his wife are admissible under Rule 801(d)(2)(E), which provides that a statement is not hearsay if it "was made by the party's coconspirator during and in furtherance of the conspiracy" and offered against that party. Fed. R. Evid. 801(d)(2)(E). "A statement is 'in furtherance of' a conspiracy if it is intended to promote the objectives of the conspiracy." *United States v. Clark*, 18 F.3d 1337, 1342 (6th Cir. 1994) (quoting *United States v. Hamilton*, 689 F.2d 1262, 1270 (6th Cir. 1982)). "Statements that have been found to be 'in furtherance of' conspiracies include statements identifying other conspirators and their roles in the conspiracy, statements to inform other conspirators of the activities or status of the conspiracy, and statements as to the source or purchaser of controlled substances." *United States v. Hitow*, 889 F.2d 1573, 1581 (6th Cir. 1989) (internal citations omitted). Melvin Skinner mentioned Capers twice in his conversation with Shirley Skinner:

-7-

| | |
|---|---|
| Melvin Skinner: | I got to get the lawyer and, you know.  Ah, don't, I don't know, you probably ought not to spend no more money.  You need to get to, to Capers. |
| Shirley Skinner: | Okay |
| Melvin Skinner: | And tell him what's going on that ah. |
| Shirley Skinner: | Okay |
| Melvin Skinner: | I think that, that he's ah, a damn, Uh, you know, NARC or a damn, uh, I don't know what he is.  I just don't know but it's him, it's him. |
| Shirley Skinner: | Who? |
| Melvin Skinner: | Mike |
| Shirley Skinner: | Not Capers? |
| Melvin Skinner: | No, it's not, no, not him, it's Mike. |

Skinner then said:

| | |
|---|---|
| Melvin Skinner: | Okay.  Have you talked to ah, Capers at all? |
| Shirley Skinner: | I've been, not directly, but yeah. |
| Melvin Skinner: | Okay. Ah, you need to get Johnny, or whatever. |
| Shirley Skinner: | Yeah. |
| Melvin Skinner: | And ah, you need to tell him what's going on here, you know. |
| Shirley Skinner: | Uh-huh |
| Melvin Skinner: | And, uh, I, I need my money back, from, from, you know? |
| Shirley Skinner: | Uh Huh |
| Melvin Skinner: | You know who? |
| Shirley Skinner: | Yeah. |
| Melvin Skinner: | I need, need the money I loaned him, you know. |
| Shirley Skinner: | Yeah. |
| Melvin Skinner: | Cause I got to get out of this and that other guy is some kind of a damn ah, ah, he's some kind of federal agent or a NARC, or whatever.  I'm fixing to get to the bottom of it, cause you know I. |

Whether Skinner's statements were made in furtherance of the conspiracy is a close call.  On

one hand, Skinner's conversation with his wife centered on the conditions of his confinement,

contacting his attorney, and his belief that he had been set up.  Skinner does not directly identify

Capers as a member of the conspiracy.  The conversation merely suggests that Capers owed Skinner

money.  Arguably, Skinner did not intend to promote the objectives of the conspiracy or identify

participants in the conspiracy while talking to his wife. On the other hand, Skinner's instruction to his wife to contact Capers and his identification of Mike as an informant may have been intended to apprise the conspirators of Skinner's arrest and its effect on the status of the conspiracy. "Where the admissibility of coconspirators' statements presents a very close call, the district court's findings generally should not be disturbed." *Id.* at 1581. Furthermore, admission of these statements did not affect Capers's substantial rights. *See Emuegbunam*, 268 F.3d at 406. The conversation only mentions Capers twice, and its substance is nearly incomprehensible. Skinner did not state directly that Capers was involved in the conspiracy or provide any details of his involvement. The statement merely shows that Skinner wanted his wife to contact Capers. Admittedly, the government mentioned this conversation in its closing argument, highlighting that the first person Skinner wanted his wife to call was Capers. However, the jury was instructed that the lawyers' statements are not evidence. Because admissibility presented a close call and admission of these statements did not affect Capers's substantial rights, we find that the court did not plainly err by admitting these statements.

C.

Capers claims that the district court should not have admitted recordings during his cross-examination that the government played during its case-in-chief. Specifically, Capers argues that this evidence should have been excluded under Federal Rule of Evidence 403, which states: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . needlessly presenting cumulative evidence." We review the district court's decision to admit the recordings for abuse of discretion because Capers's counsel objected to introduction of the recordings on cross-examination. *United States v. Frederick*, 406 F.3d 754, 761 (6th Cir. 2005).

An abuse of discretion occurs when this court is "left with the definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *United States v. Copeland*, 321 F.3d 582, 596 (6th Cir. 2003) (quoting *United States v. Haywood*, 280 F.3d 715, 720 (6th Cir. 2002)). Because the district court maintains broad discretion to weigh the Rule 403 considerations, this court "look[s] at the evidence in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *United States v. Poulsen*, 655 F.3d 492, 509 (6th Cir. 2011) (quoting *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir. 1993)).

During cross-examination, the government compared the recordings with Capers's testimony on direct examination. The government asserts that its purpose for doing so was "to clarify for the jury that the actual conversations were different than the way Capers was trying to spin them." We find that the district court did not abuse its discretion in determining that such a direct comparison was probative and that its probative value was not outweighed by the danger of needlessly presenting cumulative evidence.

D.

Next, Capers claims that the prosecutor committed prosecutorial misconduct by referring to him as "Mr. Mom" throughout his closing arguments. Because Capers did not object to use of this term at trial, his claim is reviewed for plain error. *United States v. Henry*, 545 F.3d 367, 376 (6th Cir. 2008). We must first determine whether the statements were improper. *United States v. Tarwater*, 308 F.3d 494, 511 (6th Cir. 2002). In doing so, we recognize that the prosecution had "wide latitude" to respond to Capers's strategies and arguments. *Bedford v. Collins*, 567 F.3d 225, 233 (6th Cir. 2009) (quoting *Henry*, 545 F.3d at 377). If the statements were improper, we must

determine whether they were flagrant and whether they justify reversal. *Id.* We consider: "1) whether the comment was likely to mislead the jury or otherwise prejudice the defendant; 2) whether it was an isolated occurrence or part of an extensive pattern; 3) whether it was made deliberately or by accident; and 4) whether the prosecution's other evidence was strong." *Id.*

The government argues that Capers presented himself as a stay-at-home dad who would not have been involved in a drug conspiracy, and it used Capers's "Mr. Mom" phrase to expose the weakness of his theory. Capers's counsel, in his opening statement, said: "How is Capers doing? He is Mr. Mom these days. He is at home taking care of his daughter while his wife is working. You know, modest home, no assets, no hidden money. Nothing." Capers also testified on direct examination that for a period of time he stayed at home and took care of his daughter. Defense counsel asked him if he knew the expression "Mr. Mom." Capers responded: "[I]t's a little unusual in our society for a man to be the caretaker of the children. Like I said before, my wife had better money, better benefits, dental, medical and I actually had more experience with children." Capers presented himself, through counsel's opening statement and on direct examination, as "Mr. Mom." Therefore, it was not improper for the prosecution to use the expression to persuade the jury that Capers's theory was implausible. Additionally, it is highly unlikely that use of the phrase "Mr. Mom" prejudiced Capers or misled the jury. The statement does not suggest that Capers did anything that was not shown at trial, and it does not suggest that he has some trait that might inflame the jury. As a result, we find that the government did not commit prosecutorial misconduct by using the phrase "Mr. Mom."

E.

Capers also claims that there was insufficient evidence to support his conviction of conspiracy to distribute and possess with intent to distribute 1,000 kilograms or more of marijuana. He argues that the only testimony linking him to the conspiracy was that of James Michael West, which was "inconsistent, contradictory and not supported by any viable corroborating evidence." Capers also points out that, although the government presented proof that Capers's and West's phones made contact twenty-two times between August 2005 and July 2006, only one call was recorded. Capers maintains that the testimony of all the witnesses from trial only shows that Capers introduced West to Skinner. The government responds that West and other coconspirators testified extensively about Capers's involvement in the conspiracy.

Sufficient evidence supports a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). To convict Capers of conspiracy to distribute in excess of 1,000 kilograms of marijuana, the government had to prove "(1) an agreement to violate drug laws, in this case 21 U.S.C. § 841(a)(1); (2) knowledge and intent to join the conspiracy; and (3) participation in the conspiracy." *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005). It is not necessary to prove a formal agreement; "a tacit or material understanding among the parties is sufficient to show a conspiracy." *United States v. Pearce*, 912 F.2d 159, 161 (6th Cir. 1990).

West's testimony, the phone records showing contact between Capers, Skinner, and West, and the phone recordings between West and Shearer, were sufficient for a rational trier of fact to conclude that (1) there was an agreement to distribute marijuana; (2) Capers knew of and intended

-12-

to join the conspiracy; and (3) he participated in the conspiracy, mainly by recruiting Skinner as a driver and taking a percentage of Skinner's compensation. Capers's argument that West is not credible fails because at this stage we are "bound to make all reasonable inferences and credibility choices in support of the jury's verdict." *United States v. Springer*, 609 F.3d 885, 891 (6th Cir. 2010) (quoting *United States v. Hughes*, 895 F.2d 1135, 1140 (6th Cir. 1990)). Moreover, "it is well-settled that uncorroborated testimony of an accomplice may support a conviction in federal court." *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999). Therefore, we find that the evidence presented at trial was sufficient for a rational trier of fact to find Capers guilty of conspiracy to distribute and possess with intent to distribute in excess of 1,000 kilograms of marijuana.

F.

Next, Capers claims that there was insufficient evidence to support his conviction of conspiracy to commit money laundering. He points out that the government did not produce records showing financial transactions, large amounts of money, or other assets or bank accounts. The government responds that Capers engaged in "promotional money laundering" by "making Skinner available to transport proceeds from West's drug sales to Arizona and bring back additional marijuana purchased with those proceeds."

It is a crime for any person to conduct or attempt to conduct a financial transaction involving the proceeds of unlawful activities, "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(A)(i). Promotional money laundering "involves the reinvestment of proceeds of unlawful activity into the illegal scheme from which the proceeds were derived." *United States v. Crosgrove*, 637 F.3d 646, 654 (6th Cir. 2011). For

example, a person commits promotional money laundering when he uses the proceeds of earlier drug sales to buy drugs to sell. *United States v. Warshak*, 631 F.3d 266, 317 (6th Cir. 2010). West's testimony established that Capers arranged for Skinner to deliver drug sale proceeds to Arizona and purchase marijuana, which he transported back to Atlanta. These acts were in furtherance of the promotional money-laundering conspiracy whereby the conspirators reinvested the proceeds of drug sales to purchase marijuana in Arizona. The government was not required to show that Capers engaged in certain financial transactions or possessed large amounts of money or other assets or bank accounts. Consequently, we find that the evidence presented at trial was sufficient for a rational trier of fact to find Capers guilty of conspiracy to commit money laundering.

G.

Capers claims that venue was improper to charge him with the money-laundering conspriacy because there was no proof that he "engaged in financial transactions" within the Eastern District of Tennessee. In response, the government argues that acts in furtherance of the promotional money-laundering conspiracy occurred in the Eastern District of Tennessee. The district court's interpretation of venue statutes is reviewed *de novo*. *Kerobo v. Sw. Clean Fuels, Corp.*, 285 F.3d 531, 533 (6th Cir. 2002). However, this court reviews for abuse of discretion the district court's decision not to dismiss the case for improper venue. *Id.* The money-laundering statute provides that a prosecution may be brought in

> (A) any district in which the financial or monetary transaction is conducted; or
> (B) any district where a prosecution for the underlying specified unlawful activity could be brought, if the defendant participated in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted.

-14-

18 U.S.C. § 1956(i)(1). Alternatively, venue is proper in "any other district where an act in furtherance of the . . . conspiracy took place." 18 U.S.C. § 1956(i)(2).

Trial testimony showed that Skinner delivered marijuana, purchased with money obtained from drug sales, to West's home in Mooresburg, Tennessee, and a house in Cosby, Tennessee. West purchased the home in Mooresburg using money from marijuana sales. Moreover, West invested money from the trafficking proceeds in a property development called Market Square in Knoxville, Tennessee. Because these acts were in furtherance of the promotional money-laundering conspiracy and took place within the Eastern District of Tennessee, we find that venue was proper to charge Capers with conspiracy to commit money laundering.

## H.

Finally, Capers claims that his trial counsel, Mark Sallee, provided ineffective assistance because he had an actual conflict of interest in representing Capers. Capers asserts that Sallee was a regular customer at an art gallery that West owned in Atlanta. "As a general rule, a defendant may not raise ineffective assistance of counsel claims for the first time on direct appeal, since there has not been an opportunity to develop and include in the record evidence bearing on the merits of the allegations." *United States v. Martinez*, 430 F.3d 317, 338 (6th Cir. 2005) (quoting *United States v. Wunder*, 919 F.2d 34, 37 (6th Cir. 1990)). However, the court will review an ineffective assistance of counsel claim on direct appeal where "the record is adequately developed to allow the court to properly assess the merits of the issue." *United States v. Williams*, 612 F.3d 500, 508 (6th Cir. 2010) (quoting *United States v. Fortson*, 194 F.3d 730, 736 (6th Cir. 1999)). Capers presented no evidence to support his assertion that Sallee was a customer at West's art gallery. Accordingly,

this claim is premature and can only be raised in a post-conviction proceeding under 28 U.S.C. §2255.

In sum, we reject William Capers Jordan's claims and affirm his convictions and sentence.

III.

A.

We now address the arguments raised by Gray Jordan. Gray first claims that the district court erred in admitting Special Agent David Lewis's testimony because it assessed the reliability of Lewis as an agent, rather than examining the reliability of his testimony in this case. Gray points out that the court noted Lewis's history of testifying as an expert and his professional experience. Gray also argues that the district court did not evaluate Lewis's reasoning or methodology. Finally, Gray contends that the court erred by not providing a limiting instruction as to Lewis's dual fact and opinion testimony. Plain error review applies because Gray did not object to admission of Lewis's testimony at trial. *United States v. Johnson*, 488 F.3d 690, 697 (6th Cir. 2007).

The government provided notice pursuant to Federal Rule of Criminal Procedure 16(a)(1)(E) that it intended to offer Lewis's expert testimony. The notice stated that Lewis graduated from the DEA Academy in Quantico, Virginia, and has worked for the Tennessee Bureau of Investigation and Drug Enforcement Administration for twenty years. None of the defendants objected to Lewis's testimony before trial. At trial, Melvin Skinner, Gray's co-defendant, objected to Lewis's testimony on the basis that it would not assist the jury in understanding the issues. The district court overruled this objection, noting that "[Agent Lewis's] *testimony* [under Rule 702] is relevant and it is reliable. I do believe that it will be helpful to the jury to understand the facts of this case." (emphasis added.) The court also recognized that Lewis had testified as an expert on many prior occasions.

-16-

This court has consistently found that drug enforcement agents' testimony is relevant and aids the jury's understanding of drug dealing. *United States v. Lopez-Medina*, 461 F.3d 724, 742 (6th Cir. 2006). Here, the court specifically found that Lewis's testimony was reliable. In challenging this determination, Gray does not explain how Lewis's testimony was unreliable or how his reasoning and methodology were flawed. As noted above, Lewis has twenty years of experience and special training and has testified as an expert many times. Consequently, we find that the district court did not plainly err in admitting Lewis's testimony.

A witness may testify as a fact witness and an expert witness if there is a cautionary jury instruction regarding the witness's dual roles or a clear demarcation between the fact and expert testimony. *United States v. Nixon*, 694 F.3d 623, 629 (6th Cir. 2012). Lewis began his testimony by discussing his personal involvement with this case. The government then questioned Lewis about his professional qualifications and training. The government proceeded to ask: "In your opinion, Agent Lewis, based on your training and experience, what is the way that marijuana is packaged for purposes of trafficking?" The government asked Lewis several more questions, qualifying each one with "[i]n your opinion and your training and experience." A review of the transcript demonstrates that Lewis's fact testimony was clearly demarcated from his opinion testimony. Furthermore, at the close of trial, the court gave the following instruction: "A witness who has special knowledge, skill, experience, training or education may testify and state an opinion concerning such matters. You do not have to accept the opinion. In deciding how much weight to give it, you should consider the witness' qualifications and how he reached his conclusion." Because there was a clear demarcation between Lewis's fact and opinion testimony and the court gave a general instruction on weighing

expert testimony, we find that the district court did not plainly err by not giving a contemporaneous dual-role limiting instruction.

B.

Next, Gray claims that the district court twice interfered with his right to present a defense by not admitting testimony of his 2002 car accident and by making statements that "chilled counsel's ability to present witnesses." "[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Varner v. Stovall*, 500 F.3d 491, 499 (6th Cir. 2007) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). This includes the right to present relevant evidence, subject to reasonable restrictions. *Id.* First, Gray asserts that, during his defense, he called Joseph Horton to testify that Gray had been in a car accident in 2002, but the court excluded Horton's testimony. This testimony, according to Gray, would have shown that Gray did not participate in drug trafficking after the accident because of his health. Gray's second argument consists entirely of the following three sentences: "[O]n January 30, 2009, there was an off the record side bar. As a result of that sidebar, defense counsel for Jordan stopped putting on witnesses. Jordan submits that the sidebar chilled his right to present a defense."

Turning to the first argument, we note that Horton and another witness, Nancy Jordan, testified that Gray was involved in an accident in 2002 and was hospitalized as a result. At trial, Horton stated that "in 2002 . . . Gray was driving en route to New Orleans to visit his family who was there . . . . He got in a really horrible car accident and rolled his car several times." The government objected to this testimony on the basis of relevance, and the court instructed defense counsel to ask Horton about the "time frame" instead. Nevertheless, Horton continued to testify about the accident, and the court did not exclude this testimony. Gray's mother also testified that

-18-

Gray had been in an accident and was hospitalized. Accordingly, we find that Gray was not denied his right to present this defense. Gray's second argument fails because he does not identify what was discussed during the sidebar and how that affected his ability to present a defense. We find that he waived this argument by failing to develop it. *See Johnson*, 440 F.3d at 846.

C.

Gray claims that the district could should have provided the jury with an instruction on the bill of particulars because the government introduced evidence outside of the allegations in the bill of particulars. At trial, Gray requested the following instruction:

> I instruct you that when a bill of particulars has been furnished, the government is strictly limited to the particulars which it has specified, that is, the bill of particulars limits the scope of the government's proof at trial. Remember that each defendant is on trial here only for the crimes charged in the indictment as limited by the bill of particulars and not for any other acts. Do not return a guilty verdict unless the government proves the crimes charged in the indictment as limited by the bill of particulars beyond a reasonable doubt.

Gray claims that this instruction is a correct statement of the law, not covered in another instruction, and was important to Gray's defense.

Because Gray requested the jury instruction at trial, this court reviews the district court's decision not to give the instruction for abuse of discretion. *United States v. Blanchard*, 618 F.3d 562, 573 (6th Cir. 2010). The district court commits reversible error only if the requested instruction "is (1) correct, (2) not substantially covered by the actual jury charge, and (3) so important that failure to give it substantially impairs defendant's defense." *Id.* (quoting *United States v. Heath*, 525 F.3d 451, 456 (6th Cir. 2008)). Even if Gray were able to show the first two prongs above, he has not offered any argument for how the failure to give the instruction substantially impaired his

-19-

defense, and we cannot ascertain any prejudice upon review of the record. As a result, we find that the court did not abuse its discretion by not providing a jury instruction on the bill of particulars.

D.

According to Gray, the district court also should have instructed the jury that evidence of one conspiracy could not be used to prove the other and that the money-laundering conspiracy charge was unrelated to the drug-trafficking conspiracy charge. In response, the government argues that a multiple conspiracy instruction was not required because Gray was charged with participating in one criminal enterprise with two goals—the distribution of marijuana and the reinvestment of the profits from the marijuana distribution.

This claim is reviewed for plain error because Gray did not request a "multiple conspiracies" instruction. *United States v. Semrau*, 693 F.3d 510, 527 (6th Cir. 2012). As discussed above, the district court commits reversible error if the jury instruction was correct, not substantially covered by the jury charge, and failure to give it substantially impaired the defense. *Blanchard*, 618 F.3d at 573. Reversal is only required if Gray was prejudiced by the failure to give the instruction. *United States v. Caver*, 470 F.3d 220, 246 (6th Cir. 2006). One of the primary purposes of the multiple conspiracies instruction is to prevent the transference of guilt from defendants involved in one conspiracy to defendants involved in another. *United States v. Kelsor*, 665 F.3d 684, 695 (6th Cir. 2011). This concern is not present here because Gray was charged in both conspiracies. The district court also explained to the jury: "It is your duty to separately consider the evidence against each defendant on each charge, and to return a separate verdict for each one of them. For each charge, you must decide whether the government has presented proof beyond a reasonable doubt that a particular defendant is guilty of that charge." Because of this instruction and the fact that Gray was

charged with participating in both conspiracies, we find that Gray was not prejudiced by the absence of a multiple conspiracies instruction and therefore the court did not plainly err.

Gray claims that, for sentencing purposes, the district court improperly attributed to Gray the entire amount of marijuana involved in the conspiracy. Gray also argues that the district court improperly placed the burden of persuasion on Gray to disprove the amount of marijuana attributed to him. When reviewing the district court's calculation of the Sentencing Guidelines range, the clearly erroneous standard applies to the court's findings of fact. *United States v. Jimenez*, 605 F.3d 415, 420 (6th Cir. 2010), *abrogated on other grounds by Tapia v. United States*, 131 S. Ct. 2382, 2391 (2011). The government has the burden of proving the amount of drugs attributable to the defendant by a preponderance of the evidence. *United States v. Mahaffey*, 53 F.3d 128, 131 (6th Cir. 1995). If the exact amount of drugs is uncertain, the court can make an estimate if it is supported by competent evidence. *United States v. Keszthelyi*, 308 F.3d 557, 576 (6th Cir. 2002). In doing so, the court should "err on the side of caution." *Id.* A coconspirator is held accountable for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction." U.S.S.G. §1B1.3(a)(1)(B).

The district court determined that Gray was responsible for the entire amount of marijuana involved in the conspiracy: 8,260.51 kilograms. Consequently, Gray's base offense level was 34, which applies to offenses involving at least 3,000 kilograms but less than 10,000 kilograms of marijuana. U.S.S.G. § 2D1.1. At the sentencing hearing, Gray objected to the PSR's determination

that he was responsible for the entire quantity of marijuana involved in the conspiracy. Denying this objection, the court made the following findings:

> The codefendants' testimony at trial established that from 2000 until 2002 codefendant Skinner transported approximately 9,600 pounds of marijuana. From 2005, 2006 Skinner transported 2,025 pounds of marijuana plus a final load of 986 pounds for a total of 12,611 pounds. Larry Helm delivered 800 pounds of marijuana in 1989, 800 pounds in 2000 and approximately 2,000 pounds in 2003 for a total of 3,600 pounds. Mark Cort delivered 300 pounds of marijuana in 2003 and 800 pounds in 2004. Scott Willyard transported approximately 900 pounds of marijuana during 2005 and 2006. This results in a total of 18,211 pounds of marijuana which converts to 8,260.50 kilograms of marijuana.

Also during the hearing, the court stated that "[d]efendant's participation spanned the entire length of the conspiracy as to the money laundering and until 2002 for the marijuana distribution. . . . Defendant is being held accountable for 8260.50 kilograms of marijuana which is a conservative estimate of the amount of marijuana transported and control[led] by the conspiracy." Gray argues that he withdrew from the marijuana-trafficking conspiracy in 2002 and should not be held responsible for any marijuana distribution after that time. Even if the court should have considered only the amount of marijuana Gray was accountable for until the time he ended his participation in the marijuana-trafficking conspiracy (as opposed to the time before which he ended his participation in the money-laundering conspiracy), such an error would be harmless because the court found that Gray was responsible for at least 3,000 kilograms of marijuana by 2002. The record supports the court's finding that from 2000 until 2002, Skinner transported approximately 9,600 pounds of marijuana with Gray's assistance in Tucson. The record also supports the court's finding that Larry Helm, a coconspirator, drove to and from Tucson with at least 800 pounds of marijuana in 2000. These amounts total 4,717 kilograms of marijuana, which is also within the range for a base offense

level of 34. Because any potential error would not have affected Gray's sentence, it was harmless and remand is unnecessary. *See United States v. Hazelwood*, 398 F.3d 792, 801 (6th Cir. 2005).

During the sentencing hearing, the district court said to Gray's counsel: "[Y]ou have the burden of persuasion. You get the last say." As Gray points out, this was a misstatement of the law by the court. However, when the statement is viewed in context, it is obvious that the court did not actually place the burden of persuasion on Gray. It merely recognized that because Gray objected to the PSR's calculation of the drug quantity, his counsel was entitled to speak twice. There are no other indications in the record that the court required Gray to disprove, rather than requiring the government to prove, the drug quantity for which Gray was held accountable. Accordingly, we find that the court did not err in applying a base offense level of 34 to Gray.

F.

Finally, Gray claims that the district court should not have imposed a three-level adjustment for Gray's managerial role pursuant to U.S.S.G. § 3B1.1. This provision provides that the court should increase the offense level by three "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). To distinguish whether a defendant was a leader or organizer as opposed to a manager or supervisor, the court can consider "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, [and] the claimed right to a larger share of the fruits of the crime." U.S.S.G. § 3B1.1, n.4. It is uncontested that the conspiracy included five or more participants.

The district court overruled Gray's objection to the enhancement at sentencing, explaining that

-23-

> [t]he trial testimony established the defendant joined the conspiracy in the late 1990s coordinating loads of marijuana being shipped, stashed and packaged for transport from Arizona to Tennessee and other locations. The defendant acted as liaison for Mike West with his source of supply and marijuana courier. He was responsible for receiving drug money to be delivered to the sources of supply and payment for marijuana, maintaining stash houses in Tucson and Sedona, Arizona and arranging for transportation of marijuana from Arizona to Atlanta, Tennessee and elsewhere. The defendant met the marijuana courier with money [and] instructions on how the marijuana was to be packaged and sealed once it was obtained from [the seller]. The defendant instructed the courier on where to drop the loaded vehicles in Atlanta.

At trial, coconspirator Matthew David Sugameli testified that when he acquired marijuana for the conspiracy, Gray told him how to package the marijuana. Sugameli also testified that Gray asked him to use a "bug detector" to determine whether there were any bugs, *i.e.*, transmitting devices, in the marijuana. West testified that, during the conspiracy, he would talk on the phone with Gray and Gray would tell him when the money arrived, whether the courier had the right amount of money, and how much marijuana was being delivered. Joanne West described Gray as a liaison in Arizona who would obtain the marijuana and ensure that the drivers received it. This testimony provided the district court with a sufficient basis to determine that Gray was a manager or supervisor in the marijuana-trafficking conspiracy. Turning to the money-laundering conspiracy, West testified that Gray set up an account with an escrow title agency to purchase the property and put the deed in his name. Gray was also in charge of some of the construction on the property. Newman testified that Gray helped to build more housing on the Hawaiian property. This testimony supports the court's finding that Gray was a manager or supervisor of the money-laundering conspiracy. Accordingly, we affirm the court's application of the enhancement.

## IV.

For the reasons provided above, we deny Capers's and Gray's claims and affirm their convictions and sentences.