NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0724n.06

No. 11-3472

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Aug 06, 2013**
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| Plaintiff-Appellee, | ) | STATES DISTRICT COURT FOR |
| | ) | THE NORTHERN DISTRICT OF |
| v. | ) | OHIO |
| | ) | |
| DWAYNE A. DAVIS, JR., | ) | |
| | ) | AMENDED OPINION |
| Defendant-Appellant. | ) | |
| | ) | |

Before: MOORE, SUTTON, and DONALD, Circuit Judges.

**BERNICE BOUIE DONALD, Circuit Judge.** In the early morning hours of October 7, 2008, two bodies were found on West Grand Boulevard in Detroit. The victims had been shot in the head, with their money and cell phones taken from them.

But this was no unresolved murder-mystery whodunit. An investigation revealed that Dwayne Davis, Jr. concocted and executed a plan to exact vengeance for a drug deal gone awry. A jury convicted him of traveling interstate to further an unlawful enterprise in violation of 18 U.S.C. § 1952(a)(2)(B); using a firearm to commit murder during and in relation to a crime of violence in violation of 18 U.S.C. §§ 924(c)(1)(A) and 924(j); and tampering with evidence in violation of 18 U.S.C. § 1512(c)(1).

Davis now appeals his convictions and sentence, asserting that (1) the district court improperly denied his motion to suppress; (2) the district court erred by failing to dismiss the case

on improper venue grounds; (3) the district court erred by failing to issue a jury instruction on the lesser-included offense of second-degree murder; (4) a life sentence for a mentally-disabled homicide offender violates the Cruel and Unusual Punishments Clause of the Eighth Amendment; and (5) the evidence is insufficient to sustain his convictions. We are unpersuaded by his arguments and therefore **AFFIRM** his convictions and sentence.

## I.

### A.      The Murder

In September 2008, Dwayne Davis contacted Robert Susko, asking him to procure some cocaine for Davis to sell. The two knew each other through Tracy Hart, Davis' girlfriend and Susko's colleague. To fulfill Davis' request, Susko turned to Paul Gonzalez; once Susko and Gonzalez had the product in hand, the two delivered the goods to Davis. Davis, in turn, sold the cocaine to Tim Smith.

Smith, however, was not happy with the quality of the product. When Davis complained to Susko and Gonzalez, Gonzalez indicated that there would be no reimbursement. Davis later told Smith, "No one rips me off, I'll kill those guys, no one plays me like a sucker."

True to his vow, Davis hatched a plan to lure his two associates to Michigan to kill them. On October 6, 2008, he successfully convinced Susko to go with him from Cleveland to Detroit on a quest to buy marijuana; Gonzalez, however, declined the invitation to join them.

Susko and Davis, the two would-be traffickers, needed a driver. They found their man in David Miller—a friend of Susko's—who agreed to drive the trio to Detroit in exchange for gas and

marijuana. On his way out of the house, Miller told his mother that he was going to Detroit to gamble.

Cell tower records revealed the group's journey across state lines. Susko's last call was made in Detroit at 11:04 PM, near the place where he and Miller were later found dead. Shortly therafter, Davis exchanged a series of twenty phone calls with an associate, Demetrious Ross. Davis asked Ross to pick him up from the MGM Grand Casino in Detroit. Ross agreed, and began his trek to Michigan.

On his way there, Ross received a suspicious call: the number belonged to Susko, but Davis' voice was on the other line. Ross decided to turn back and returned to Cleveland. Davis, now in need of a ride home, used Susko's phone to call another acquaintance, Masur Yaar, to arrange transport from Detroit. Yaar, fast asleep, did not pick up, and Davis left a voicemail in which the sounds of a casino could be heard.

At approximately 4:11 a.m. the next morning, the Detroit Police Department received an emergency call reporting that two bodies were found on the street: that of Susko and Miller. Police officers found a bullet in each victim's head. Forensic analysis revealed that the bullets—one found in Miller's head and the other in Susko's mouth—were fired from the same gun. An autopsy concluded that the men had been killed execution style. No money or cell phones were found on either corpse.

Later that day, at some time between noon and two in the afternoon, Devon Vales—one of Davis' customers—visited Davis' home. Davis asked Vales to help him dispose of Miller's vehicle. The two drove over in separate cars to a nearby park, with Davis driving Miller's car and Vales

following closely behind. Once they arrived, Davis exited Miller's car, got into Vales', and unzipped his jacket. In doing so, Davis revealed a bloodied shirt.

Vales drove to a nearby gas station. Davis bought gasoline and placed it in a container, returned to Miller's vehicle, poured the gasoline on the car, and lit it ablaze. He later explained the entire plot and its motive to Vales, describing the killing itself with vivid detail. The charred remains of Miller's car were eventually recovered by Cleveland police. Blood samples found in the vehicle were matched to Susko and Miller.

A couple of days later, Davis met Ross at a bar. When the two overheard chatter about Susko and Miller's deaths, Davis boasted to Ross, "I told you I was going to get them." At Ross' behest, Davis recounted the events. Davis repeated the story to others, including two of his customers and his girlfriend.

## B.    The Confession

We now skip ahead to November 20, 2009. At the time, Davis was incarcerated in a state penitentiary for an unrelated firearms violation. Agent Burke of the FBI was looking for Davis so that he could execute an active federal arrest warrant for carjacking. Davis was escorted from the prison's confines to a squad car, where Burke read Davis his *Miranda* rights from a standard form. Detective Toth of the Westlake Police Department accompanied the two to the local police station. Davis was then processed and led into a conference room; once situated, he received another set of standard-form *Miranda* warnings.

Agent Burke testified that Davis willingly confessed to the events that led to the deaths of Miller and Susko. According to Burke, he reduced the confession to writing, explained and read the draft to Davis, allowed Davis to make changes, and had Davis sign the written confession.

In an evidentiary hearing, Davis told a different story. He testified that, after Burke and Toth explained the evidence against him, he "just shut them down" and invoked his right to counsel by asking, "Well, when would I be able to see my attorney, like when would I be able to talk to my attorney?" Burke purportedly responded, "Well, Mr. Davis, you're not cooperating, you're not helping yourself. You really need to help yourself." Davis continued his protest, exclaiming "What did I do wrong? How can I help myself when I don't know nothing? You're all basically telling me to talk to you all about things I don't even know."

In this version of recollected events, Burke then informed Davis that an attorney would not be available until the next weekday. The two agents stopped their questioning and provided Davis with dinner and medication. Afterwards, Burke and Toth resumed their session. They asked probing questions about Davis' health and sought to acquire background information that Davis described as "orient type stuff, like how you get processed to jail." Davis testified that he "never got questioned throughout the whole interrogation. Not once did [he] ever get questioned, honest to God truth." According to him, he only signed the written confession because it was presented as a protective measure; Davis allegedly had no understanding that the statement was indeed a confession. Had he understood the written document as such, Davis asserted, he "would never have signed it."

## C.   The Courtroom

We now channel our focus to the events of the courtroom.  A federal grand jury seated in the Northern District of Ohio returned an indictment against Davis, charging him with one count of traveling interstate to commit a crime of violence to further an unlawful activity in violation of 18 U.S.C. § 1952(a)(2)(B) ("The Travel Act"); one count of knowingly using and carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. §§ 924(c)(1)(A) and 924(j); and one count of tampering with evidence in violation of 18 U.S.C. § 1512(c)(1).

Davis filed a motion to suppress his confession on the grounds that Agent Burke continued interrogating him despite his invocation of the *Miranda*-based right to counsel.  He also filed a motion to dismiss the case for improper venue, asserting that Michigan—the scene of the murder—was the proper location for trial.

The trial court denied the motion to suppress on the grounds that Davis validly waived his right to counsel and, in doing so, credited Burke and Toth's testimony over Davis'.  It also denied the venue motion, finding sufficient the Government's representations that some of the elements of the charged crimes occurred in Ohio.

Davis also moved for a jury instruction on the lesser-included offense of second-degree murder.  The district court denied that motion as well, explaining that "[f]rom the state of the evidence," the court could not discern the lesser-included offense because "certain evidence was not presented."

After a five-day trial, the jury returned a guilty verdict against Davis on all counts.  The court sentenced Davis to life imprisonment.  Davis timely appealed.

**II.**

The appellant raises five arguments on appeal. He assigns error to (1) the district court's denial of his motion to suppress his confession; (2) its denial of his venue motion; and (3) its denial of his request for a jury instruction on the lesser-included offense of second-degree murder. He also challenges the sufficiency of the evidence and the constitutionality of his sentence.

A.

We review a district court's decision to deny a motion to suppress under a dual standard: findings of fact are reviewed for clear error, while legal conclusions are reviewed *de novo*. *United States v. Cochrane*, 702 F.3d 334, 340 (6th Cir. 2012). Even if we discern error, we need not reverse if the error is harmless. *See United States v. Garcia*, 496 F.3d 495, 512 (6th Cir. 2007).

Davis first challenges the district court's denial of his motion to suppress an inculpatory statement he made to Agent Burke. Typically, "the remedy for a *Miranda* violation is to exclude the tainted statement." *United States v. Sanders*, 472 F. App'x 376, 381 (6th Cir. 2012) (citing *Miranda v. Arizona*, 384 U.S. 436, 492 (1966)). But here, we have nothing to exclude and therefore no remedy to grant: Davis' statement was never admitted into evidence at trial. Therefore, we consider Davis' challenge moot. *See United States v. Trinh*, 665 F.3d 1, 17 (1st Cir. 2011).

B.

We are similarly unmoved by Davis' venue argument. While we conduct *de novo* review of a district court's interpretation of a venue statute, we review its overarching decision to deny a venue motion for abuse of discretion. *See United States v. Jordan*, Nos. 11-6143, 11-6084, 2013 WL 163969, at *8 (6th Cir. Jan. 16, 2013) (quoting *Kerobo v. Sw. Clean Fuels Corp.*, 285 F.3d 531, 533

(6th Cir. 2002)). Section 3237 of Title 18 provides that "any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." Venue is appropriate in the federal district where "the conduct comprising the essential elements of the offense occurred." *United States v. Wood*, 364 F.3d 704, 710 (6th Cir. 2004). Put differently, venue is proper in all locations in which the acts constituting a particular crime took place. *Id.* (quoting *United States v. Cabrales*, 524 U.S. 1, 6-7 (1998)).

For purposes of the Travel Act, 18 U.S.C. § 1952(a), "venue lies in any district in which the travel occurred, including the district in which it originated, even if intermediate destinations were involved." *United States v. Burns*, 990 F.2d 1426, 1436-37 (4th Cir. 1993) (citations omitted). In this case, Davis crossed state lines from Ohio to Michigan with the intent to commit a crime of violence: murder. *See* 18 U.S.C. § 1952(a)(2) (2006) ("Whoever travels in interstate . . . commerce . . . with intent to . . . commit any crime of violence to further any unlawful activity."). The fact that he started his journey from Cleveland makes the Northern District of Ohio a proper venue for prosecution under the Travel Act. *See Burns*, 990 F.2d at 1436-37.

As for the firearm-use charge, Davis seems to suggest that the location in which the underlying crime of violence was *completed* is the only proper venue for prosecution. Our precedent says otherwise. "Where venue is appropriate for the underlying crime of violence, so too it is for the § 924(c)(1) offense." *United States v. Rodriguez-Moreno*, 526 U.S. 275, 282 (1999). Here, venue for the underlying crime of violence—murder as defined by 18 U.S.C. § 1111—is proper in the Northern District of Ohio because Davis hatched his plot and executed parts of it in Cleveland. The

fact that Davis completed the homicidal act in Michigan is of no matter; premeditation is an essential element of first-degree murder, and it is an essential element that occurred in the Northern District of Ohio. *See* 18 U.S.C. § 1111(a) (" . . . any other kind of willful, deliberate, malicious, and premeditated killing . . . is murder in the first degree."). Accordingly, we conclude that the Government prosecuted Davis in an appropriate venue.

## C.

Turning to the district court's denial of Davis' proposed jury instruction, we see no availing argument there, either. We review a district court's denial of a properly-made request for a jury instruction on a lesser-included offense for an abuse of discretion. *United States v. LaPointe*, 690 F.3d 434, 439 (6th Cir. 2012). Four considerations guide our inquiry as to whether a district court properly denied a particular instruction. We examine whether

> (1) a proper request is made; (2) the elements of the lesser offense are identical to part of the elements of the greater offense; (3) the evidence would support a conviction on the lesser offense; and (4) the proof on the element or elements differentiating the two crimes is sufficiently disputed so that a jury could consistently acquit on the greater offense and convict on the lesser.

*United States v. Colon*, 268 F.3d 367, 373 (6th Cir. 2001) (citing *United States v. Monger*, 185 F.3d 574, 576 (6th Cir. 1999)). To succeed under this test, a defendant must show that "(1) the elements of the lesser offense are a subset of the elements of the charged offense; and (2) the evidence would allow a rational jury to find the defendant guilty of the lesser offense but not guilty of the charged offense." *United States v. Waldon*, 206 F.3d 597, 604-05 (6th Cir. 2000).

Davis' proposed jury instruction was derived from a jury instruction we examined in *United States v. Garcia-Meza*, 403 F.3d 364 (6th Cir. 2005). It reads as follows:

> To kill with malice aforethought means, with respect to second degree murder either killing another person deliberately and intentionally or to act with a callous and wanton disregard for human life. A callous and wanton disregard means recklessness, evidencing an extreme disregard for human life. To find malice aforethought, you need not be convinced that the defendant hated the person or felt ill will toward the victim at the time.

*Id.* at 371.

As Davis properly raised his request for this instruction, we begin with the second *Colon* factor: whether the elements of the lesser-included offense are identical to part of the elements of the greater one. All federally-cognizable murders require proof of malice aforethought. *See* 18 U.S.C. § 1111(a) (2006); *see also United States v. Milton*, 27 F.3d 203, 206 (6th Cir. 1994) (observing that the "malice aforethought" requirement extends to second-degree murder). Unlike first-degree murder, however, second-degree murder is a crime of exclusion: it is every type of murder that falls outside of the circumstances enumerated in the statute. *See* 18 U.S.C. § 1111(a) ("Any other murder is murder in the second degree."). But so long as there is an "unlawful killing of a human being with malice aforethought," the crime of murder has occurred. As both offenses have this requirement in common, the second *Colon* question is satisfied: the elements of second-degree murder are identical to part of the elements for murder in the first degree.

The differentiating element, however, is premeditation. It is here that Davis' claim fails. There was sufficient evidence to prove Davis' motive, planning, and claim of responsibility for the killings—all key ingredients in the recipe for premeditation. As our sufficiency review below

suggests, the evidence supporting premeditation was so ample that no rational jury could find him guilty of second-degree murder but not guilty of murder in the first degree. Given this conclusion, the district court did not err in declining to issue Davis' proposed jury instruction.

D.

We now address the heart of the case against Davis: whether sufficient evidence supported the jury's verdict. In reviewing Davis' sufficiency challenge, we are tasked with examining the evidence in the light most favorable to the Government, and in doing so, must draw all inferences in its favor. *United States v. Gibbs*, 182 F.3d 408, 419 (6th Cir. 1999). In conducting this inquiry, we ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Amawi*, 695 F.3d 457, 475 (6th Cir. 2012) (quoting *United States v. Humphrey*, 279 F.3d 372, 378 (6th Cir. 2002)).

Davis picks small nits with the Government's case. He makes three arguments in particular: first, the Government's timeline for the murder was unrealistic; second, those who testified against him were biased and received favorable treatment from the Government in exchange for their testimony; and finally, the Government failed to explain why Davis would commit the crime in Michigan, when it was just as convenient to do so in Ohio. These contentions, however, fail to acknowledge the bigger picture.

The Government proved a pre-existing, narcotics-based relationship between the defendant and one of the victims, Susko. It then showed a motive for the killings that arose from this relationship: Susko and a companion had sold Davis a bad batch of cocaine. Witnesses testified that Davis later expressed his intent to seek retaliation for the botched drug deal, developing a scheme

for executing such retaliation. Other witnesses attested to the fact that Miller traveled with Susko and Davis to Detroit. Phone records proved Susko's communication with Davis, as well as the trio's travel from Ohio to Michigan.

Miller and Susko were later found dead in Detroit, having been killed execution-style. Adding to the evidentiary heap, several witnesses testified that Davis discussed the crime with associates, customers, and even his girlfriend. Perhaps the most damning of all was Davis' attempt to conceal the murder by burning Miller's car, which contained blood samples traceable to the two victims he allegedly killed. This last fact was enough to find Davis guilty of an entirely separate crime—that of evidence tampering.

With the evidence provided by the Government and the reasonable inferences drawn therefrom, a rational jury could have found that the elements of first-degree murder were demonstrated here beyond a reasonable doubt. As for Davis' attempt to cast aspersions on the witnesses who testified against him, we are "bound to make all . . . credibility choices in support of the jury's verdict." *United States v. Springer*, 609 F.3d 885, 891 (6th Cir. 2010) (quoting *United States v. Hughes*, 895 F.2d 1135, 1140 (6th Cir. 1990)). It was the jury's prerogative to credit the testimony of the Government's witnesses; therefore, in this regard and on the whole, Davis' challenge to the sufficiency of the evidence fails.

E.

Finally, we turn to Davis' sentence. He contends the district court's decision to sentence him to life imprisonment violates the Cruel and Unusual Punishments Clause of the Eighth Amendment. In support of his argument, he turns to the Supreme Court's decisions in *Miller v. Alabama*, 132 S.

Ct. 2455 (2012) and *Atkins v. Virginia*, 536 U.S. 304 (2002). He claims that the two cases, read together, suggest that "those with limited intellectual capacity cannot be subjected to the harshest penalties our society imposes," including the life imprisonment imposed upon him.

Davis asks us to engage in Eighth-Amendment alchemy by melding *Miller* and *Atkins* together to fashion some sort of alloyed caselaw that would shield him from a life sentence. We decline Davis' invitation to do so. *Miller* and *Atkins* had separate penological underpinnings. *Miller* and its predecessor, *Graham v. Florida*, 130 S. Ct. 2011 (2010), largely honed in on the tension between the penological rationale of rehabilitation and the impossibility of achieving such a rationale in a life-without-parole scenario for juveniles. *See Miller*, 132 S. Ct. at 2645. *Atkins*, on the other hand, focused on a mentally-disabled offender's diminished capacity and the corresponding diminution of culpability. *See Atkins*, 536 U.S. at 318. The two cases were motivated by different justifications and thus are incompatible for any sort of constitutional hybridization.

In short, Davis is not a juvenile, which precludes him from invoking *Miller* to ward off life imprisonment. *Atkins* is also of no avail, as it is apposite only when a mentally-disabled offender is sentenced to die, for "death is simply different." *See United States v. Moore*, 643 F.3d 451, 455 (6th Cir. 2011). Consequently, we discern no valid constitutional basis for vacating Davis' life sentence.

**III.**

For the reasons set forth above, we **AFFIRM** Davis' convictions and sentence.

**KAREN NELSON MOORE, Circuit Judge, concurring.** I concur in the majority's opinion, except for its discussion of Davis's sentence. Although I agree that Davis's sentence does not violate the Eighth Amendment, I base my conclusion on different legal grounds. *Miller v. Alabama* held that a mandatory life-without-parole sentence is unconstitutional as applied to juveniles. 132 S. Ct. 2455, 2469 (2012). The problem with the mandatory sentencing schemes in *Miller* was that they "prevent[ed] the sentencer from taking account of" the considerations that make juveniles "'less deserving of the most severe punishments,'" including their "diminished culpability and greater prospects for reform." *Id.* at 2466, 2464 (quoting *Graham v. Florida*, 130 S. Ct. 2011, 2026 (2010)). In this case, even if *Miller* were extended to apply to other categories of offenders with diminished culpability—for example, mentally retarded defendants, *see Atkins v. Virginia*, 536 U.S. 304 (2002)—Davis received exactly the kind of individualized consideration required by *Miller*. He did not face a mandatory life sentence, and the district court explicitly took into account his cognitive impairments when fashioning an appropriate sentence. *See* R. 129 (Sent. Hr'g Tr. at 12–15) (Page ID #1314–17). Accordingly, I agree that Davis's sentence should be affirmed.